PEOPLE v STOUGHTON

Docket No. 112864. Submitted March 8, 1990, at Detroit. Decided
    August 22, 1990.

Scott D. Stoughton was charged in Detroit Recorder's Court with
    three counts of first-degree murder. The prosecution made a
    pretrial motion for permission to present testimony at trial
    regarding the results of several electrophoretic analyses of
    dried bloodstains found at the crime scene. The court, Maureen
    P. Reilly, J., denied the motion, ruling in part that (1) the
    Wraxall thin-gel multisystem method of serological electropho-
    resis has not achieved general acceptance for reliability in the
    scientific community, (2) the modified single system method of
    testing the phosphoglucomutase subgroup using a zero agarose
    gel, while it enjoys acceptance in the scientific community, has
    not been subjected to independent validation, and (3) a scien-
    tific study published in a scientific journal and indicating that
    reliability of serological electrophoresis is not compromised by
    the presence of contaminants at a crime scene was not admissi-
    ble because the results of that study had not been validated by
    an independent study. The prosecution appealed by leave
    granted.

The Court of Appeals held:

1. The trial court did not err in determining that the Wraxall
    thin-gel multisystem method of serological electrophoresis has
    not achieved general scientific acceptance for reliability.

2. Since the single system method of testing the phosphoglu-
    comutase subgroup using a zero agarose gel enjoys general
    scientific acceptance for reliability, independent validation of
    this method is not required. The trial court therefore erred in
    determining that this method had to be independently vali-
    dated.

3. The trial court erred in determining that the scientific
    study had to be independently validated. The study has been

REFERENCES

Am Jur 2d, Evidence §§ 370, 1104.

Admissibility, in criminal cases, of evidence of electrophoresis of
    dried evidentiary bloodstains. 66 ALR4th 588.

sufficiently subjected to the scrutiny of the scientific community through its publication in a scientific journal.

Affirmed in part; reversed in part.

1. CRIMINAL LAW — SCIENTIFIC EVIDENCE — SEROLOGICAL ELECTRO-
   PHORESIS.

   The Wraxall thin-gel multisystem method of serological electro-phoresis has not achieved general acceptance for reliability in the scientific community; accordingly, the results of such test are not admissible as evidence in a criminal trial.

2. CRIMINAL LAW — SCIENTIFIC EVIDENCE — SEROLOGICAL ELECTRO-
   PHORESIS.

   Serological electrophoretic testing of the phosphoglucomutase subgroup through a single system method using a zero agarose gel enjoys general acceptance for reliability in the scientific community; accordingly, the results of such test may be admit-ted as evidence in a criminal trial.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *John D. O'Hair,* Prose-cuting Attorney, *Timothy A. Baughman,* Chief of the Criminal Division, Research, Training and Appeals, and *Don W. Atkins,* Principal Attorney, Appeals, for the people.

State Appellate Defender (by *Ronald J. Bretz*), for defendant on appeal.

Before: GRIBBS, P.J., and CAVANAGH and R. B. BURNS,* JJ.

CAVANAGH, J. The prosecution appeals by leave granted the trial court's denial of the prosecution's motion to permit testimony regarding the results of serological electrophoresis of dried bloodstains. The prosecution argues in this appeal that, be-cause the Wraxall multisystem method of electro-phoretic testing has achieved general scientific acceptance for reliability among impartial and

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

disinterested experts, the test results should be admissible. In the alternative, the prosecution maintains that the results from the modified method of testing conducted in this case should be admissible because these tests avoided the problems associated with the multisystem method.

I

Electrophoresis has been defined as

a physical method for the separation of biologically important proteins through the use of electric current. Proteins are very complex molecules which assume positive, negative, or neutral charges depending on the solution in which they are placed. When these charged molecules are placed on an appropriate medium and subjected to an electrical field, they will migrate toward the pole of the opposite charge. Blood proteins vary in size, shape, density, and charge; consequently they vary in electrophoretic mobility. Therefore, after electrophoresis, they are separated into distinct bands on the supporting medium.[1]

The distinct bands form characteristic patterns that reveal protein subtypes and each banding pattern is distinctive for a particular protein or enzyme. Information about the blood can be ascertained from the patterns that form. The blood sample can then be classified into a particular population grouping based on the particular factors found, and compared with samples from known donors. A specific individual cannot be identified using electrophoresis but he can be excluded as the source of an evidentiary sample.

---

[1] *People v Young (After Remand)*, 425 Mich 470, 477-478; 391 NW2d 270 (1986), citing Grunbaum, "Potential and Limitations of Forensic Blood Analysis," in *Handbook for Forensic Individualization of Human Blood and Bloodstains,* quoted in Jonakait, *Will blood tell? Genetic markers in criminal cases,* 31 Emory L J 833, 840 (1982).

The blood sample is generally tested for the following different proteins: phosphoglucomutase (PGM), esterase D (ESD), glyoxylase 1 (GLO), erythrocyte acid phosphatase (EAP), haptoglobin (HP), adenylate kinase (AK), and adenosine deaminase (ADA). By using a combination method, it is possible to test for more than one genetic marker per sample per run. In the Wraxall Group I multisystem test, PGM, ESD, and GLO are developed on the same gel. In Group II, EAP, AK and ADA are developed on the same gel. In contrast, the conventional single system method develops only one marker on a gel at a time.

II

On December 2, 1987, the bodies of Betty Long and Christopher Feltner were found in their home in Taylor, Michigan. Each body had multiple stab wounds and, as a result, there was a large amount of bloodstained evidence available. Three days later, on December 5, 1987, the defendant was charged with three counts of first-degree murder. MCL 750.316; MSA 28.548. On February 25, 1988, the circuit court judge heard arguments on the prosecution's motion to permit testimony regarding the results of serological electrophoresis of dried bloodstains and ordered a *Davis-Frye* [2] hearing to determine (1) whether the electrophoretic method employed in testing the dried bloodstains from the crime scene had gained general scientific acceptance for reliability in the scientific community, (2) whether any crime scene contaminants had distorted the test results, and (3) whether Dr. Benjamin Grunbaum, a principal critic of the use of the Wraxall multisystem variation of electro-

---

[2] *Frye v United States,* 54 US App DC 46; 293 F 1013 (1923), and *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955).

phoresis, had changed his opinion since testifying in *People v Young (After Remand),* 425 Mich 470; 391 NW2d 270 (1986) (*Young II*).[3]

At the *Davis-Frye* hearing, the prosecution presented the testimony of four expert witnesses to show the scientific community's acceptance of the reliability of electrophoresis in general and the Wraxall thin-gel multisystem method specifically. In rebuttal, the defense presented the testimony of one expert witness, Dr. Benjamin Grunbaum, to contest whether the scientific community had accepted the Wraxall method.

Dr. Grunbaum repeated his concern that the "filter used in the test of the ESD molecules has the unintended effect of compromising the [later] analysis of the PGM and GLO molecules." *Young II, supra,* p 491. The PGM and GLO bands can overlap with the ESD band and Dr. Grunbaum's criticism centers on the filter paper used to develop the ESD, the first marker to be developed. The defense witness believes that the filter paper used to develop the ESD marker absorbs some of the PGM and GLO molecules and that this absorption can lead to errors when the PGM and GLO molecules are subsequently analyzed. The intensity of the PGM bands are not the same after application of the filter paper.

As to the specific tests conducted in this case, the prosecution witnesses testified that the ESD and GLO markers were done on a multisystem and that the PGM and the EAP markers were tested individually on a separate gel. More precisely, the Wraxall Group I multisystem was used to develop PGM, ESD, and GLO, but the PGM data was not reported from

---

[3] In *People v Young (After Remand), supra,* the Supreme Court held that the Wraxall multisystem method of electrophoresis had not at that time achieved general scientific acceptance for reliability. Dr. Benjamin Grunbaum was the only witness to dispute the reliability of the Wraxall methodology.

this test. The PGM subtyping was done separately, using a modified single system approach, and these results were reported. The Wraxall Group II multisystem was used to develop EAP and AK, but the AK results were not reported and the ADA marker was not developed.

In rebuttal, the defendant's expert offered his opinion that the modifications to the single system method used to develop the PGM marker made the results unreliable because these modified techniques have never been standardized or validated.

The reliability of blood samples degraded by possible crime scene contaminants was also in dispute. The prosecution witnesses believed that contaminants did not present a problem because if contamination did occur the markers could not be read. One of the expert witnesses, Dr. Bruce Budowle, and his coauthor, Robert Allen, a professor from the University of South Carolina, apparently confirmed this theory when they studied the possible effects of crime scene contaminants and presented the results to the scientific community.

The defendant's expert disagreed and felt that the Budowle/Allen paper on the contaminant issue had no scientific validity because the authors did not release the underlying data from their research for others to review.

### III

On October 17, 1988, the trial court issued its opinion and order denying the prosecution's motion. The trial court held that

> the prosecution ha[d] not sustained its burden of establishing by independently conducted validation studies the reliability of the thin-gel multisystem analysis of dried blood stains [sic], or the modified

single system conventional typing of the PGM subgroup used in this case. Further, the prosecution ha[d] not provided an independent, validated study of the effects of contaminants on crime scene stains as required by the majority in *Young*. Finally, Dr. Grunbaum's position remain[ed] basically unchanged from that stated in *Young*.

Under findings of fact and conclusions of law, the trial court determined that the dried bloodstains had been preserved and tested within acceptable time limits for the accurate reading of genetic markers. Secondly, the trial court found that the electrophoretic methods employed in this case had not been independently validated as reliable. The Wraxall Group I multisystem had been used to simultaneously test for three different proteins, PGM, ESD and GLO. However, the court decided that, since the filter used to test the ESD marker had not come into contact with the region where the GLO band was developed, there was no compromise of the GLO analysis. And, although the multisystem test results of the PGM marker would only be used to confirm the results obtained from the modified conventional PGM subgroup method used here, an overlap with the underlying PGM molecules had occurred.

The trial court also found that the second test used in this case was a modified version of the conventional PGM subgroup method using a zero EEO agarose gel. The modification was in the use of the zero agarose gel and the trial court concluded that there were no published validation studies of this specific methodology. Finally, the Wraxall Group II was used to test for EAP and AK, although the AK results were not reported.

The trial court recognized in its opinion that the *Young II* Court was concerned with the reliability of the Wraxall thin-gel multisystem because of the

unintended effect of compromising the later analysis of PGM and GLO. The trial court also acknowledged that since the decision in *Young II* no independent study verifying the reliability of the thin-gel multisystem or the modified single system method had ever been published. The trial court went on to find that

> even without such a formal validation process, the evidence clearly shows that the relevant scientific community has adopted the single system electrophoresis technique (where there is no overlapping of filters to detect genetic markers on the gel), as a valid, reliable method for determining genetic markers in dried blood, provided competent analysts perform the tests with adequate samples in compliance with approved laboratory protocols for the methods used.

The opinion stated however that "this consensus of reliability of the single system method, assuming compliance with agreed-upon guidelines, does not meet the validation requirements of *Young.*" The trial court concluded that the prosecution did not carry its burden of proving "that the methods used in this case, i.e., Group I and Group II multisystem testing and PGM subgroup testing using zero EEO agarose have been validated by independently conducted studies . . . ." Furthermore, the prosecution's argument that widespread use and acceptance of the multisystem validated the methodology did not meet the requirements of *Young II.*

As to the issue of contamination, the trial court concluded that the Budowle/Allen study presented by the prosecution also failed to meet the validation standard articulated in *Young II.* The trial court believed that the published findings from the Budowle/Allen study on crime scene contaminants had to be validated by an independent, published study.

IV

Findings of fact made by a trial court will not be reversed on appeal unless they are clearly erroneous. MCR 2.613(C). A finding is clearly erroneous if, after a review of the entire record, the appellate court is left with a definite and firm conviction that a mistake has been made. *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).

As to the findings of fact made in the present case, after our very careful review of the record, we are not convinced that mistakes of fact have been made. There is ample support for the factual conclusions reached below.

We also agree with the trial court's conclusion that the prosecution has failed to show the scientific community's agreement on the reliability of the Wraxall thin-gel multisystem as prescribed in *Young II.* There is no evidence that "independently conducted validation studies on the thin-gel multisystem analysis [have been] undertaken . . . and the results subjected to the scrutiny of the scientific community." *Young II, supra,* p 476

Furthermore, the proseuction's argument that *use* of this system in laboratories throughout the world demonstrates its acceptance in the scientific community is without merit. Justice Boyle in her dissent acknowledged that the "multisystem . . . has been used by the FBI since 1979 [and] is in use in more than one hundred crime laboratories in the country . . . ." *Young II, supra,* p 523. In addition, the dissenting opinion discussed the significance of the testimony of an FBI employee who works "in a laboratory that does 8,500 electrophoretic examinations a month, ninety percent of which are done by the multisys-

tem." *Young II, supra,* p 514. We must assume from this that evidence of widespread use was before the Supreme Court the first time this issue was addressed and was not persuasive.

We would also agree that the prosecution has failed to show that things have changed since the decision in *Young II.* Apparently, the scientific community still disputes the reliability of the Wraxall multisystem when a possible compromise in the analysis of blood proteins is present. Consequently, we must affirm that part of the trial court's decision denying the admission of the Wraxall multisystem results where the reliability of the technique is "a specific question left unresolved." *Young II, supra,* p 495. We can only conclude that the *Young II* decision bars any testimony based on test results from the Wraxall multisystem.

As to the admissibility of testimony based on the modified single system method, we again agree with the trial court's finding that the "evidence clearly shows that the relevant scientific community has adopted the single system electrophoresis technique . . . as a valid, reliable method for determining genetic markers in dried blood, provided competent analysts perform the tests with adequate samples in compliance with approved laboratory protocols for the methods used."[4] Where we disagree is in the trial court's conclusion that the single system is also subject to the "independent validation" standard articulated in *Young II.*

In our opinion, *Young II* imposed the require-

---

[4] As to reliability of the electrophoretic method used in a particular case, we again agree with the trial court that unanimity within the scientific community on laboratory guidelines should not preclude the admissibility of the test results "as long as the defense is offered the opportunity to fairly examine the evidence and cross-examine the analyst." Facts affecting the weight and credibility of an expert's opinion should be placed before the factfinder.

ment of independent validation because the scientific community could not reach a consensus on the reliability of the Wraxall multisystem. Apparently, when members of the relevant scientific community disagree, *Young II* makes it incumbent on those members to resolve the conflict, possibly through the publication of independently conducted validation studies.

However, we believe that, when the evidence clearly shows that the single system technique enjoys general scientific acceptance, satisfaction of the independent validation standard from *Young II* is not required. Because the single system method of electrophoresis has been accepted by the relevant scientific community and is not subject to the independent validation requirement of *Young II,* the trial court erred in ruling that testimony based on the test results from the modified single system is inadmissible.

As to the crime scene contamination issue, we disagree with the trial court's determination that the Budowle/Allen paper itself had to be validated by an independent study. We are convinced that the Budowle/Allen study satisfied *Young II's* demand for "comprehensive control tests evaluating the effects of different contaminants," and find that through the paper's publication in a scientific journal "the results have been subjected to the scrutiny of the scientific community." *Young II, supra,* p 476.

Affirmed in part; reversed in part.