## PEOPLE v GISTOVER

Docket No. 114508. Submitted June 19, 1990, at Lansing. Decided
    May 6, 1991, at 10:10 A.M. Leave to appeal denied, 438 Mich 871.

Lawrence J. Gistover was convicted of first-degree murder follow-
    ing a jury trial in the Genesee Circuit Court, Judith A. Fuller-
    ton, J., and pleaded guilty of being an habitual offender, second
    offense. The defendant appealed, claiming that the trial court
    erred in ruling that the results of electrophoretic testing of
    dried bloodstains found on his clothing and a statement made
    by him to a police officer before he was advised of his *Miranda*
    rights were admissible.

The Court of Appeals *held:*

1. Electrophoretic typing of dried bloodstains has gained
general scientific acceptance for reliability and is admissible in
a criminal trial where, as in this case, samples of known types
are used as controls for comparison; a second, independent
analysis of the results is performed by another analyst; typing
is done by analysts who periodically undergo proficiency test-
ing; there is adherence to established protocols; only unambigu-
ous banding patterns are reported; and typing of phosphogluco-
mutase (PGM), glyoxylase 1 (GLO), and esterase D ($E_sD$) markers
is not performed simultaneously.

2. The defendant's statement to the police officer was made
before his arrest. *Miranda* warnings therefore were not neces-
sary.

Affirmed.

CRIMINAL LAW — SCIENTIFIC EVIDENCE — SEROLOGICAL ELECTROPHO-
    RESIS.

Electrophoretic typing of dried bloodstains is admissible in a
    criminal trial where, at a minimum, samples of known types
    are used as controls for comparison; a second, independent
    analysis of the results is performed by another analyst; typing
    is done by analysts who periodically undergo proficiency test-

REFERENCES

Am Jur 2d, Evidence §§ 106, 370, 1104, 1147.

Admissibility, in criminal cases, of evidence of electrophoresis of
    dried evidentiary bloodstains.

ing; there is adherence to established protocols; only unambiguous banding patterns are reported; and typing of phosphoglucomutase (PGM), glyoxylase 1 (GLO), and esterase D (E$_8$D) markers is not performed simultaneously.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Robert E. Weiss,* Prosecuting Attorney, *Donald A. Kuebler,* Chief, Appellate Division, and *Gladys L. Christopherson,* Assistant Prosecuting Attorney, for the people.

*Daniel D. Bremer,* and Lawrence J. Gistover, in propria persona.

Before: GRIFFIN, P.J., and SHEPHERD and DOCTOROFF, JJ.

SHEPHERD, J. Defendant appeals as of right his jury conviction of first-degree murder, MCL 750.316; MSA 28.548, and subsequent plea of guilty of being an habitual offender, second offense, MCL 769.10; MSA 28.1082, claiming that the trial court erred in allowing the admission into evidence of results of electrophoretic testing done on a dried evidentiary bloodstain taken from a leg of defendant's blue jeans. We find, after a careful review of the record, that the trial court did not err in this regard. Defendant also claims that the trial court erred in failing to suppress a statement given by defendant to a police officer before defendant's arrest. We disagree and, therefore, affirm defendant's conviction.

The starting point for our analysis of the first issue raised by defendant is the so-called *Davis-Frye* rule, a culmination of the reasoning in the cases of *Frye v United States,* 54 US App DC 46, 47; 293 F 1013 (1923); *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955), and *People v Barbara,* 400 Mich 352; 255 NW2d 171 (1977), which allows

for the admission of expert testimony concerning a novel form of scientific evidence only if it is established that the evidence has achieved general scientific acceptance among impartial and disinterested experts in the field. The party offering the evidence has the burden of demonstrating that it has been accepted as reliable by the scientific community. *People v Young,* 418 Mich 1, 17-20; 340 NW2d 805 (1983). We must also be mindful of the standard by which we review a trial court's findings of fact. Those findings will not be disturbed on appeal unless they are clearly erroneous. MCR 2.613(C). A finding is clearly erroneous if, after a review of the entire record, the appellate court is left with a definite and firm conviction that a mistake has been made. *People v Stoughton,* 185 Mich App 219, 227; 460 NW2d 591 (1990).

Electrophoresis was aptly described in *People v Reilly,* 196 Cal App 3d 1127, 1137-1138; 242 Cal Rptr 496 (1988), as follows:

> Electrophoresis is a method for separating charged molecules, and its use for detecting genetic markers in blood is mechanically uncomplicated. "[A] test sample is placed on a gel medium in an ionized buffer solution. When an electric current is run through the solution, the sample separates and migrates on the medium into characteristic patterns. These are then fixed, dyed, and read visually by the analyst. (See Jonakait, *Will Blood Tell?* (1982) 31 Emory L J 833, 836-842.)" ([*People v*] *Brown, supra,* 40 Cal 3d 512, 529 [230 Cal Rptr 834; 726 P2d 516 (1985).]
>
> Of the many genetic marker systems that have been identified in blood, only about a dozen are currently considered useful in typing dried as opposed to liquid blood. This is because some markers do not "persist" well—i.e., they lose mobility—in the dried state. One of the more persistent markers is the red cell antigen system ABO,

which is *not* tested through electrophoresis. The others are polymorphic enzyme or protein marker systems, which include [phosphoglucomutase (PGM), esterase D ($E_sD$), glyoxylase 1 (GLO), erythrocyte acid phosphatase (EAP), haptoglobin ($H_p$), adenylate kinase ($A_k$), and adenosine deaminase (ADA)]. The basic electrophoretic process is the same whether for liquid or dried blood. Depending on the particular marker being tested, there will be variations in the buffer solution, the amount of electric current, the length of time allowed for separation and migration, the type and thickness of the gel (medium), and the catalytic agent used for staining. Predetermined sets of these variations, called protocols, are developed for each marker.

The characteristic pattern of a marker displays itself in the finished gel (the electrophoretogram) as a series of bands. The pattern for each marker is distinct because each protein or enzyme carries a slightly different charge, causing it to migrate through the gel at a different rate. Test results are read visually according to the color, number, position and relative intensity of the bands. Several gels are usually tested at one time on a single "plate." Samples of known types ("controls" or "standards"), screened beforehand to determine degrees of genetic variance, are often included for comparison of banding and to ensure that enough time has been allowed for separation. The control or standard thus acts to safeguard against mistyping. Other safeguards include repeating tests (the amount of sample permitting), having a second analyst independently interpret the gel, and photographing the gel for future reference (although it is preferable to read the gel directly and even better if the second analyst sees the development process as opposed to just the end result.) The original gel is often hard to preserve. Because interpreting the results calls for some subjective judgment, the competence, experience and training of the analyst are important. [Emphasis in original.]

Defendant does not argue that electrophoresis in general lacks acceptance or reliability, but, rather, only that the method is not accepted or reliable when dried evidentiary bloodstains are involved. Of the sixteen or so jurisdictions that have addressed the issue,[1] most often under the standard enunciated in *Frye v United States, supra,* Michigan is the only one that has deemed electrophoretic testing of dried evidentiary blood samples to be inadmissible. The dispute centers on the thin-gel multisystem and, most particularly, the method developed by Brian Wraxall and Mark Stolorow, which simultaneously analyzes several genetic markers on a single, thin-layer starch gel. This Court has held that electrophoretic testing of an evidentiary bloodstain using a single system method does enjoy general scientific acceptance for reliability and is, thus, admissible as evidence. See *Stoughton, supra,* p 229.

In *People v Young (After Remand),* 425 Mich 470; 391 NW2d 270 (1986), a sharply divided Michigan Supreme Court held that the prosecution in

---

[1] Those states include California (*People v Morris,* 199 Cal App 3d 377, 383-390; 245 Cal Rptr 52 [1988]; *People v Reilly,* 196 Cal App 3d 1127; 242 Cal Rptr 496 [1987]); Massachusetts (*Commonwealth v Gomes,* 403 Mass 258, 272; 526 NE2d 1270 [1988]); Nevada (*Santillanes v State,* 104 Nev 699, 703-705; 765 P2d 1147 [1988]); South Dakota (*State v Adams,* 418 NW2d 618, 621 [SD, 1988]); Oklahoma (*Plunkett v State,* 719 P2d 834, 839-840 [Okla, 1986], cert den 479 US 1019 [1986]); Kansas (*State v Washington,* 229 Kan 47, 54-56; 622 P2d 986 [1981]); Illinois (*People v Henne,* 165 Ill App 3d 315, 327-328; 116 Ill Dec 296; 518 NE2d 1276 [1988]; *People v Partee,* 157 Ill App 3d 231, 260-263; 110 Ill Dec 845; 511 NE2d 1165 [1987], cert den 484 US 1072 [1988]); Florida (*Correll v State,* 523 So 2d 562, 567 [Fla, 1988], cert den 488 US 871 [1988]); Maryland (*Smith v State,* 62 Md App 627; 490 A2d 1307 [1985]); New York (*People v McCain,* 134 AD2d 287; 520 NYS2d 613 [1987]); Arizona (*State v Beaty,* 158 Ariz 232; 762 P2d 519 [1988], cert den 491 US 910 [1989]); Georgia (*Graham v State,* 168 Ga App 23; 308 SE2d 413 [1983]); Virginia (*O'Dell v Commonwealth,* 234 Va 672; 364 SE2d 491 [1988], cert den 488 US 871 [1988]); New Mexico (*State v Chavez,* 100 NM 730; 676 P2d 257 [1983]); and Pennsylvania (*Commonwealth v Middleton,* 379 Pa Super 502; 550 A2d 561 [1988]).

that case failed to establish that the results of electrophoretic testing of evidentiary bloodstains had achieved general scientific acceptance for reliability among impartial and disinterested experts in the scientific community because there was disagreement within that community on three issues: the length of time that genetic markers, particularly EAP, can be accurately read in dried blood; the reliability of the Wraxall thin-gel multisystem analysis; and the effects of crime scene contaminants. *Id.,* p 475.[2]

The first issue is not in dispute here because the bloodstains were taken within a day or two of the murder and preserved. See *Young (After Remand),* p 490. The *Young (After Remand)* Court's concern over the reliability of the Wraxall thin-gel multisystem stemmed from the lack of independently conducted reliability studies in light of the criticism espoused primarily by the system's outspoken critic, Dr. Benjamin Grunbaum, that the filter used in testing $E_6D$ molecules has the unintended effect of compromising the analysis of the PGM and GLO molecules. Also, at the time *Young (After Remand)* was decided, no comprehensive control tests had been conducted on the effect of common crime scene contaminants, and the scientists who testified in that case had no experience with soil or chemical contamination and, therefore, could only guess what effect those contaminants might have.

[2] We note that while the issue before the *Young (After Remand)* Court was whether serological electrophoresis of dried evidentiary bloodstains had been shown to have achieved general scientific acceptance for reliability, the *Young (After Remand)* majority, at least, focused to a great extent on the question of the reliability of the Wraxall thin-gel multisystem. In fact, the majority acknowledged that although electrophoresis had been generally accepted as reliable in the scientific community for many years, the Wraxall multisystem test was a new technique. At least one court has specifically found that the reliability of the Wraxall multisystem method was such that the test results could be presented to the jury. See *Santillanes v State,* pp 703-705.

The *Young (After Remand)* Court, on the basis of the evidence before it, found there was disagreement with regard to the effect common crime scene contaminants may have on electrophoresis and, until comprehensive control tests were conducted, the reliability of electrophoresis on dried evidentiary bloodstains remained unresolved.

As testified to below, in the wake of *Young (After Remand),* a study was done on the possible effects of various contaminants. This published study, conducted by Dr. Bruce Budowle and Professor Robert Allen, tested various contaminants such as soil, gasoline, oil, bleach, salt, detergent, acid, and base, and found that the first three had no effect on the genetic markers or the electrophoretic runs, and the acid, base, and bleach altered the $_pH$ of the electrophoretic gels so much that the distortion was easily identifiable by even a novice. Thus, concluded the authors, contaminants that could affect protein conformation, alter the $_pH$, or impart charge changes would be readily apparent because they would distort the electrophoretic gel pattern in a way that could be easily recognized by the reader.

In *Stoughton, supra,* p 229, a panel of this Court found that the Budowle/Allen study satisfied the demand for "comprehensive control tests evaluating the effects of different contaminants," and that through the study's publication in a scientific journal, the results had been subjected to the scrutiny of the scientific community, as required by *Young (After Remand).* The trial court in the present matter came to the same conclusion and, in light of *Stoughton,* we see no reason to disagree, let alone find its conclusion on this particular issue clearly erroneous.

At the *Davis-Frye* hearing conducted in this matter, the prosecution presented several wit-

nesses in an effort to demonstrate the general scientific acceptance of electrophoresis of dried evidentiary bloodstains. Defendant presented the transcribed testimony of Dr. Benjamin Grunbaum, which had been given in a different case. After reviewing all of this testimony, we find that if *Young (After Remand)* required independent validation studies of methods of electrophoresis of dried evidentiary bloodstains other than the Wraxall multisystem before test results would be admitted, the prosecution could not have met its burden. The prosecution's witnesses readily acknowledged that while electrophoresis of dried evidentiary bloodstains was reliable and had achieved acceptance in the scientific community, not much has been written on the reliability of the Wraxall multisystem and, even if someone did write a paper validating the system, it would not be published and thereby subjected to the scrutiny of the scientific community because it would not amount to original research.

However, the *Young (After Remand)* majority was concerned with the reliability of the Wraxall multisystem and imposed a requirement of independent validation because the scientific community could not reach a consensus on the reliability of that system. (The Wraxall multisystem was not used in the case at bar.) Dr. Grunbaum's testimony in the instant matter reveals that he does not object to all multisystems, just the one devised by Wraxall. He further testified that he has always believed that under certain circumstances the courts can have confidence in electrophoresis of dried evidentiary bloodstains. To him reliability means repeatability. That is, if the test can be repeated and the same conclusion reached by different analysts, the results may be deemed reliable. That is what occurred here. One analyst ran

the tests, and they were then read by a second analyst, who reached the same conclusions.

Dr. Grunbaum would also impose other guidelines on laboratories, such as requiring that their analysts be certified and subjected to periodic proficiency tests, and that they be supervised and have a quality assurance program in place which is monitored and externally enforced. The laboratory and the analysts that conducted the electrophoretic testing in the case at bar met Grunbaum's standard. For example, an established protocol was in place at the laboratory, the analysts there continually underwent both internal and external proficiency testing, controls were used, and, as noted above, two analysts read the stains independently to ensure accuracy.

The trial court found that Dr. Grunbaum's concerns had been addressed, and that the procedure in question had been shown to have gained general scientific acceptance for reliability. After reviewing the evidence presented in this matter, we cannot say that we are left with a definite and firm conviction that a mistake was made.

Contrary to defendant's assertion, we need not resolve the question whether the Wraxall thin-gel multisystem has gained acceptance in the relevant scientific community. That particular method, the reliability of which may or may not still be disputed and was the focus of concern in *Young (After Remand)*, was not used here. We agree with the *Stoughton* panel that *Young (After Remand)* "imposed the requirement of independent validation because the scientific community [as perceived by the *Young (After Remand)* majority] could not reach a consensus on the reliability of the Wraxall multisystem." *Stoughton, supra,* p 229.

According to the *Young (After Remand)* majority, there existed a dispute over the reliability of

the Wraxall multisystem when $E_sD$, PGM, and GLO were tested simultaneously because it was claimed that the filter paper used to stain $E_sD$ molecules soaks up PGM and GLO molecules, thereby allegedly compromising the PGM and GLO readings. That problem did not exist in this case because, while $E_sD$ and GLO were tested on the same gel, that gel was divided in half and the two enzymes were tested side by side. It appears that PGM was tested on a separate gel. A similar procedure was used to test for the other enzymes.

The concerns that were present in *Young (After Remand)* and, thus, the dispute over the reliability of the particular method employed in *Young (After Remand),* do not exist here. Therefore, we cannot say that the trial court's findings in this matter are clearly erroneous. We are bound by *Young (After Remand)* and, applying the reasoning utilized in *Young (After Remand),* we find no basis to conclude that the electrophoretic testing done in this case did not enjoy acceptance by the scientific community. The issue of the effect of contaminants has been studied and the study subjected to scrutiny, and there was no problem with compromise as discussed above. The test results were read independently by two analysts who came to the same conclusions, and an established protocol was followed.

In sum, we hold that where adequate safeguards have been implemented, such as utilization of samples of known types as controls for comparison, a second, independent reading by another analyst, use of analysts who periodically undergo proficiency testing, adherence to established protocols, reporting of only unambiguous banding patterns, and where PGM, GLO and $E_sD$ markers have not been typed simultaneously, the results of electrophoretic typing of dried evidentiary bloodstains

is admissible into evidence in this state because it has gained general scientific acceptance for reliability among impartial and disinterested experts in the field. Where these minimal criteria have been met, the issue of the test results' admissibility need not be relitigated in each case.[3]

We further find no merit to defendant's contention that the trial court erred in allowing a statement given by defendant to a police officer to be admitted into evidence. Defendant was not in custody at the time he gave the statement, nor was he otherwise deprived of his freedom of action in any significant way such that *Miranda* [*v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966)] warnings were required. *People v Hill,* 429 Mich 382; 415 NW2d 193 (1987).

Affirmed.

---

[3] We have attempted in this paragraph to accurately summarize the safeguards that were actually implemented in this case in order to guide those who perform such tests in future cases. If, given the lack of scientific training of appellate judges, we have not perceived the safeguards correctly, we invite the prosecutor after consultation with his experts, to ask us to correct our error by filing a timely motion for rehearing. Any correction would have to be justified by the record in this case. The issue would be whether those who perform the tests can implement accurately stated safeguards in future cases so as to obviate the necessity of relitigating admissibility in every case.