# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TOM ANTHONY WILLINGHAM,

        Defendant-Appellant.

UNPUBLISHED
August 18, 2015

No. 321586
Kent Circuit Court
LC No. 13-004018-FH

Before: SERVITTO, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his bench trial conviction for second-degree criminal sexual conduct (CSC), MCL 750.520c(1)(a) (victim under 13 years of age). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

According to the victim (who was 13 years old at the time of trial), defendant sexually touched her on two separate occasions). Defendant knew the victim's family because the victim's mother was dating defendant's nephew, Richard Roe. The victim did not testify as to the exact date of the alleged first incident. The victim estimated that it had occurred about a year before the second incident, which occurred on March 17, 2013. The victim testified that she was 12 years old at the time of the second incident. The trial court convicted defendant of charges related to the second incident, and acquitted defendant of charges related to the first incident.

Roe testified that, on March 17, 2013 (the date of the second incident), he needed medical assistance because he had contracted an infection as a result of an injury at work. The victim testified that Roe contacted defendant to take her mother and Roe to the hospital. The victim's mother testified that, as defendant did so, he had his cellular telephone in the car with him, and that he called his girlfriend, Laurie Duck, to tell her that he was going to be late for dinner.[1] Additionally, according to the victim's mother, defendant indicated that he would be heading home after he dropped off the victim's mother and Roe at the hospital. Instead, however, defendant went to the victim's home.

---

[1] Duck testified, to the contrary, that she did not hear from defendant until he came home.

According to the victim's testimony, she was standing in the dining room when defendant arrived at her home. Defendant told her that he was looking for his cellular telephone outside in the snow. The victim testified that defendant had a cellular telephone when he came inside of the house. The victim walked upstairs to her bedroom. A few minutes later, defendant walked into the victim's bedroom. The victim's brother subsequently also walked into her bedroom. Defendant asked the victim to move so that he could grab a bag of cereal, which was sitting behind the victim on the floor. Defendant then told the victim's brother to "get out" of the bedroom. The victim's brother left the bedroom, but he returned approximately three minutes later; defendant again told him to leave.

The victim testified that, after her brother left for the second time, defendant touched her leg "between the ankle and the knee" and touched the inside of her thigh. The victim pushed defendant's hand away and asked him not to touch her. Defendant then touched the victim's chest under her shirt. The victim testified that she took defendant's hand out of her shirt. Defendant proceeded to touch the victim below her chest on the outside of her shirt. Again, the victim pushed defendant's hand away. The victim told defendant "to get the beep out of my house." The victim testified that defendant then pulled his penis out of his pants. Defendant told the victim, "it's right here, if you want to play with it."

The victim's brother testified that he returned to the victim's bedroom for a third time and saw defendant touching the victim's chest. He testified that he was facing defendant's back at the time, and never saw defendant's penis.

After Roe received medical assistance, he contacted defendant to pick him up at the hospital. When defendant picked up Roe and the victim's mother, he told them, "Oh, by the way, I went back to your house to pick up my cell phone that I lost on the porch." Roe testified that he thought defendant's statement was odd because defendant had had his cellular telephone when he took Roe to the hospital.

When defendant was interviewed by police, he admitted to entering the victim's room. At first, defendant denied touching the victim at all. Later in the interview, defendant stated that he had "cupped her cheek." Defendant testified at trial that he went to the victim's house to look for his cellular phone, and that he entered the victim's room and asked the victim why her clothes were not put away in her dresser, whereupon the victim told him to get the "f*** out of her house" and defendant left.

At trial, the prosecution presented evidence of other incidents involving defendant. LO and her brother testified about a 1984 incident when they were children. Defendant lured LO into his truck, exposed his penis to her, touched her between the legs over her clothing, attempted to unzip her snowsuit, and grabbed her hand in an effort to have her touch his penis. Victoria Figueroa testified about an incident that occurred in September of 1985. After returning home from grocery shopping, she saw defendant on his porch exposing his penis. Figueroa, an adult at the time, was with her children. According to Figueroa, defendant occupied a residence in the lower part of a building and Figueroa occupied a residence in the upper part of the building. Figueroa took her children upstairs. Defendant followed Figueroa up the stairs and told the children to "[s]hut your blank mouth." The children remained in the living room while defendant took Figueroa into the bedroom and threw her onto the bed. Defendant took

Figueroa's clothes off and "tried to do it" with her. Defendant exposed his penis, but he did not penetrate Figueroa.

Defendant was convicted as described above. This appeal followed.

## II. GREAT WEIGHT OF THE EVIDENCE

Defendant argues that the trial court's verdict was against the great weight of the evidence. In reviewing a challenge to the great weight of the evidence following a bench trial, we examine the trial court's findings of fact for clear error, giving deference to the court's special opportunity to judge the credibility of witnesses. MCR 2.613(C); see also *People v Gistover*, 189 Mich App 44, 46; 472 NW2d 27 (1991). "[In] general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *People v Lemmon*, 456 Mich 625, 643; 576 NW2d 129 (1998). Exceptions exist only where

> the testimony contradicts indisputable physical facts or laws . . . is patently incredible or defies physical realities . . . [or] where a witness's testimony is material and is so inherently implausible that it could not be believed by a reasonable juror . . . or where the witness's testimony has been seriously impeached and the case marked by uncertainties and discrepancies. [*Id*. at 643-644 (internal quotations and citations omitted).]

Defendant argues that "there was no credible evidence to support the trial court's verdict against [defendant]." Defendant's testimony contradicted the victim's testimony with respect to whether defendant had touched the victim on her inner thigh and chest. While defendant challenged the victim's credibility, her testimony did not contradict indisputable physical facts or laws, was not patently incredible, was not so inherently implausible that it could not be believed, and was not seriously impeached such that the case was marked by uncertainties and discrepancies. *Id*. at 643-644. In fact, the testimony of the victim's brother corroborated aspects of the victim's testimony; specifically that defendant had touched the victim's chest.[2] Moreover, it is clear that the trial court was aware of and considered the differences in testimony in finding the victim's testimony to be more credible than defendant's testimony. We defer to the trial court's superior opportunity to judge the credibility of witnesses. MCR 2.613(C); *People v Sexton (On Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000). The evidence produced at trial did not preponderate so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v Cameron*, 291 Mich App 599, 616-617; 806 NW2d 371 (2011). Accordingly, defendant is not entitled to a new trial.

## III. OTHER-ACTS EVIDENCE

---

[2] Even absent her brother's testimony, the victim's testimony, if believed, was sufficient to establish defendant's guilt. MCL 750.520h.

Defendant also argues that the trial court abused its discretion when it admitted, under MRE 404(b), evidence of defendant's prior acts with Figueroa.[3] We review preserved evidentiary issues for an abuse of discretion, *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008), and we review questions of law de novo, *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010).

Under MRE 404(b), evidence of other acts is inadmissible to show a defendant's criminal propensity, but is admissible for other purposes, such as proving that the defendant had a common scheme, plan, or system. *Id*. at 615. The test for admissibility under MRE 404(b) is (1) the evidence must be offered for a proper purpose under MRE 404(b); (2) the evidence must be relevant under MRE 402; (3) the probative value of the evidence must not be substantially outweighed by unfair prejudice. *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993).

The prosecution initially bears the burden of offering the other-acts evidence for something other than character or propensity to act in conformance with his character. *Mardlin*, 487 Mich at 615. Here, the prosecution offered Figueroa's testimony to show that defendant had a system of exposing himself when children were nearby. This was a proper, non-propensity purpose. MRE 404(b).

Having offered the evidence for a proper purpose, the prosecution must also show that the evidence is relevant. *VanderVliet*, 444 Mich at 55. "Relevance is a relationship between the evidence and a material fact at issue that must be demonstrated by reasonable inferences that make a material fact at issue more probable or less probable than it would be without the evidence." *People v Crawford*, 458 Mich 376, 387; 582 NW2d 785 (1998). "[E]vidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *People v Sabin (After Remand)*, 463 Mich 43, 63; 614 NW2d 888 (2000). General similarity between the charged and uncharged acts does not, however, by itself, establish a plan, scheme, or system used to commit the acts. *Id*. at 64.

Here, we find it questionable at best whether Figueroa's testimony possessed "a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." *Id*. at 64. As noted, the prosecution admitted Figueroa's testimony to show that defendant had a system of exposing himself when children were nearby. The incident involving Figueroa was significantly different from the instant case in regard to defendant exposing himself. In the instant case, defendant exposed himself directly to the victim, a minor, after she rebuffed his advances. By contrast, the incident with Figueroa began with defendant exposing himself, seemingly to no one in particular, with no indication of whether Figueroa's children saw him or whether he intended them to see his indecorous act. In addition, the assault on Figueroa and any exposure that occurred incidentally during that assault bore almost no common features with defendant's decision to

---

[3] Defendant does not challenge the admission of the testimony of LO and her brother, which was properly admissible under MCL 768.27a.

expose himself to the victim in the instant case. Rather than involving a forceful assault during which his genitals were incidentally exposed at a time when no children were present in the same room, as was the case with Figueroa, defendant in the instant case exposed himself to the victim, a minor, after she rebuffed his advances. Thus, the other-acts described by Figueroa bore almost no common features with those in this case, and we believe that the acts cannot naturally be explained as part of a common plan or scheme of defendant to expose himself around children. In addition, any attempt to use Figueroa's testimony to show the existence of a common plan or scheme used by defendant to perpetrate sexual assaults would also fail based on a lack of common features. The assault on Figueroa involved a forceful assault on an adult with whom defendant did not have a pre-existing relationship. By contrast, his conduct in this case consisted of non-consensual, but non-forceful touching that was perpetrated against a minor with whom he had a preexisting relationship. The only noteworthy similarity between defendant's assault on Figueroa and his conduct in the instant case is this: defendant attempted to or did perpetrate a sexual assault. This, we think, crosses the line into the forbidden realm of propensity evidence under MRE 404(b).

However, even if the trial court erred in admitting this evidence, reversal is not required. A preserved evidentiary error is not a ground for reversal unless "after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999) (citation and quotation omitted). Here, the victim testified that defendant touched her on her inner thigh and chest. The victim also testified that defendant exposed his penis to her. The victim's brother corroborated the victim's testimony with respect to defendant touching the victim's chest. Thus, after an examination of the entire cause, even if the trial court erred in the admission of the challenged evidence, it does not affirmatively appear that it is more probable than not that such an error was outcome determinative. *Id.*; see also *People v Lanzo Constr Co*, 272 Mich App 470, 484-485; 726 NW2d 746 (2006).

Affirmed.

/s/ Deborah A. Servitto
/s/ Jane M. Beckering
/s/ Mark T. Boonstra