PEOPLE v TANNER

Docket No. 231966. Submitted October 1, 2002, at Lansing. Decided February 18, 2003, at 9:05 A.M. Leave to appeal sought.

Hattie M. Tanner was convicted by a jury in the Calhoun Circuit Court, James C. Kingsley, J., of first-degree felony murder, second-degree murder, and armed robbery as a result of the armed robbery and murder of a bartender. Following sentencing, the court entered sua sponte an amended judgment of sentencing, vacating the sentences for the convictions of second-degree murder and armed robbery. The defendant appealed.

The Court of Appeals *held*:

1. The defendant did not challenge the scientific acceptance of electrophoresis to identify blood types and phosphoglucomutase markers; therefore, she failed to preserve her claim that the court erred in failing to determine whether such scientific evidence complies with the standard that requires that novel scientific methods must be shown to have gained general acceptance in the scientific community to which they belong before being admitted as evidence at trial. In addition, the Supreme Court has recognized the general acceptance of such evidence and, therefore, the proponent of the evidence is not required to meet the standard for novel scientific evidence.

2. The claim of the defendant, an indigent, that the court denied her due process by not appointing a DNA expert or a serology expert to assist in her defense alleges a trial error, not a structural error, and is analyzed under the harmless-error standard under the federal constitution to determine if the alleged error was harmless beyond a reasonable doubt.

3. The defendant could not safely proceed to trial without the experts in the areas of DNA and serology; therefore, the trial court erred in denying the defendant's request for such assistance. Under the factual circumstances of this case, the defendant was prejudiced and received a fundamentally unfair trial as a result of not having expert assistance provided by the court. It was not beyond a reasonable doubt that a rational jury would have found her guilty if she had been provided such experts. The defendant's convictions and her sentence for the felony-murder conviction

must be reversed, and the matter must be remanded for a new trial. On remand, the court must vacate the convictions of second-degree murder and armed robbery.

4. The defendant was not denied due process as a result of the delay between the initial request for an arrest warrant by the police and the initiation of criminal charges by the prosecutor. The defendant's allegations of lost physical evidence were too speculative to establish actual and substantial prejudice. The trial court did not err in finding that the prosecution presented a proper basis for the delay. The delay was not shown to be an attempt by the prosecution to gain a tactical advantage.

5. The trial court, under the circumstances of this case, properly denied the defendant's motion for a directed verdict with regard to the charges of first-degree premeditated murder and felony murder on the theory that the defendant was the principal in committing the crime. The trial court erred in denying the defendant's motion for a directed verdict with regard to the prosecution's theory that the defendant aided and abetted in the felony murder because there was insufficient evidence to show beyond a reasonable doubt that the alleged principal committed felony murder.

6. The doctrine of double jeopardy bars the retrial of the defendant on a charge of first-degree premeditated murder because the jury acquitted the defendant of that charge.

Reversed and remanded.

R. J. DANHOF, J., dissenting in part, stated that the denial of the defendant's request for the experts did not result in a fundamentally unfair trial. Under the facts of this case, the absence of such experts was not outcome-determinative. The defendant failed to meet the burden of showing that without the experts she could not proceed safely to trial. The defendant failed to explain how the absence of an expert jeopardized her ability to prepare a defense. The alleged error in denying the request for the experts did not contribute to the defendant's guilty verdict. The conviction of felony murder and the sentence for that conviction should be affirmed.

1. EVIDENCE — SCIENTIFIC EVIDENCE.

The proponent of scientific evidence that has been judicially recognized as generally accepted in the relevant scientific community is not required to meet the standard applicable to evidence regarding novel scientific evidence adopted from *People v Davis*, 343 Mich 348 (1955), and *Frye v United States*, 54 US App DC 46 (1923).

2. WITNESSES — EXPERT WITNESSES — INDIGENTS.

A trial court's decision denying a motion to appoint an expert witness for an indigent defendant at public expense is reviewed for an abuse of discretion; the inquiry concerns whether the defendant could otherwise proceed safely to trial without the expert, and, if not, whether the defendant was prejudiced and received a fundamentally unfair trial as a result of not having expert assistance.

3. CONSTITUTIONAL LAW — FEDERAL LAW — HARMLESS ERROR.

The federal harmless-error standard is applied by Michigan courts in reviewing an alleged violation of the federal constitution; the question under this standard is whether the claimed error constitutes a structural defect in the trial that defies harmless-error analysis and requires automatic reversal or whether it amounts to a trial error occurring in the presentation of the case and which may therefore be quantitatively assessed in the context of the other evidence presented to determine whether its admission was harmless beyond a reasonable doubt; the prosecution must prove beyond a reasonable doubt that the constitutional trial error did not contribute to a guilty verdict.

4. CRIMINAL LAW — CONSTITUTIONAL LAW — PREARREST DELAY.

The Sixth Amendment right to a speedy trial does not apply to delay occurring before an arrest or initiation of a formal criminal charge; due process provides limited protection against oppressive prearrest delay; a court, in determining if due process is implicated, must balance the actual prejudice to the defendant against the state's reasons for the delay; the defendant bears the initial burden to show prejudice and the burden then shifts to the prosecution to explain the delay; a defendant must demonstrate both actual and substantial prejudice impairing the right to a fair trial to establish a due-process violation meriting dismissal; the defendant must also show that the prosecution intended to gain a tactical advantage by delaying formal charges.

5. CRIMINAL LAW — AIDING AND ABETTING.

A defendant cannot be convicted of felony murder under an aiding and abetting theory where the prosecution has failed to show the alleged principal's guilt beyond a reasonable doubt; although the guilt of the principal must be shown beyond a reasonable doubt, the principal need not be convicted, to sustain an aiding and abetting charge (MCL 750.316[1][b]).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *John A. Hallacy*, Pros-

ecuting Attorney, and *Katherine K. Miller* and *Michelle L. Richardson*, Assistant Prosecuting Attorneys, for the people.

*Arthur James Rubiner* for the defendant on appeal.

Before: COOPER, P.J., and JANSEN and R. J. DANHOF*, JJ.

JANSEN, J. Defendant was convicted by a jury of first-degree felony murder, MCL 750.316(1)(b); second-degree murder, MCL 750.317; and armed robbery, MCL 750.529. She was originally sentenced to concurrent sentences of life imprisonment without parole for the felony-murder conviction, forty to sixty years' imprisonment for the second-degree murder conviction, and twenty-five to fifty years' imprisonment for the armed robbery conviction. Thereafter, the trial court entered sua sponte an amended judgment of sentence, vacating defendant's sentences for the second-degree murder and the armed robbery convictions. She now appeals as of right. We reverse defendant's convictions and her sentence for the felony-murder conviction and remand to the trial court for a new trial.

Defendant's convictions arise from the stabbing death of Sharon Watson, a bartender at Barney's Bar and Grill (Barney's) located in Calhoun County, during the course of a robbery that occurred at the bar after 1:00 A.M. on March 22, 1995. Initially, the Battle Creek Police Department requested warrants for defendant, Dion Paav, and Robert Cady in July 1995 for their alleged involvement in the victim's robbery

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

and murder, but the prosecutor declined to issue the warrants in the fall of 1995 on the ground that there was insufficient evidence to charge these individuals. However, when a new prosecutor took office in 1997, an arrest warrant was eventually issued on May 23, 2000, for defendant only, charging her with open murder, MCL 750.316; felony murder, MCL 750.316; and armed robbery, MCL 750.529.

The case proceeded to trial in November 2000. It was the prosecutor's theory that Cady, a close friend of defendant, used his status as a trusted regular customer of Barney's to gain entrance to the bar while the victim was in the process of closing the bar. The prosecutor further theorized that defendant committed the murder with her own knife, leaving it at the bar next to a drop of her own blood. Alternatively, the prosecutor argued that defendant aided and abetted Cady in the felony murder by providing the murder weapon.

At trial, Cady was the prosecution's first witness. Cady testified that after getting out of work at 10:55 P.M. on March 21, 1995, he had planned to meet Paav at Nottke's Bowling Alley, Paav's place of work.[1] When Paav did not appear, Cady went to a bar, where he claimed that he attempted to call Paav at home. Cady testified that he then called defendant to

---

[1] There is no indication in the trial transcript that Cady, a suspect and res gestae witness in this case, was ever advised of his Fifth Amendment rights. As the Court noted in *People v Dyer*, 425 Mich 572, 578 n 5; 390 NW2d 645 (1986), "[t]he proper procedure is for the prosecutor to inform the court, out of the presence of the witness, of the possible need for the witness to be informed of Fifth Amendment rights. If the trial judge finds such a warning necessary, the court should inform the witness of his right not to incriminate himself. This should be done out of the presence of the jury."

arrange for the purchase of crack cocaine. Shortly after midnight on March 22, Cady drove to defendant's house and went with her to purchase crack cocaine. After returning to defendant's house, Cady and defendant smoked crack cocaine together. Cady testified that about one-half hour later, he left to cash a check and eventually went to Barney's at about 1:00 A.M. Cady further testified that although the bar appeared to be closed when he arrived because the sign was off, he entered through an open side door and saw Watson, a friend whom Cady had known for about two years, and an unidentified white male customer in the bar. Cady testified that because Watson had already closed out her cash register, she could not cash his check. Cady then left Barney's and went to another bar, the Green Tavern, where he cashed the check and drank a beer. Cady testified that he called defendant at about 1:30 A.M. to say that he was returning to her house. However, Cady first went to buy some more crack cocaine before stopping at defendant's house at approximately 2:30 A.M. Shortly thereafter, Cady drove home, passing by Barney's at about 2:45 A.M. According to Cady, while he found it unusual to see the bar's lights on at that hour, he nonetheless continued driving home without stopping.

Cady testified that at about 1:30 P.M. on March 22, 1995, Paav called and informed him that Watson had been found murdered in the basement of Barney's. Although Cady was concerned about talking with the police because of his use of crack cocaine, he and Paav went to talk with the police later that afternoon. According to Cady, defendant had been to Barney's only once during the last five years. Cady further tes-

tified that he knew that Barney's would close before the usual 2:00 A.M. closing time if it were a slow night. Cady admitted that he knew that after cashing out, the victim would take the money toward the back of the bar, where there was a storage area next to the bathrooms and basement stairs. Cady acknowledged that the victim also trusted Cady to watch the bar area while she cashed out. Cady also knew from talking to the victim and other bar employees that there was a safe in the basement.

On cross-examination, Cady testified that he was a friend of the victim and was trying to help the police find her killer when he became a suspect in the case. Cady also testified that he helped the police prepare two composite sketches of the man whom he claimed to have seen in the bar on the night of the homicide and robbery. Cady denied that defendant accompanied him to Barney's when he attempted to cash a check on the night in question. Cady also stated that, with the exception of being shown a picture of it, he had never seen the knife that the police recovered at Barney's.

On redirect examination, Cady testified that the victim had already cashed out by the time of his arrival at about 1:00 A.M. on March 22, 1995. Cady also admitted that, when interviewed by Officer Brad Wise of the Bedford Township Police Department on March 27, 1995, he stated that the victim would cash out early only if there were trusted regular customers in the bar. Cady further testified that during a conversation with the victim after his arrival at Barney's at about 1:00 A.M., he learned that the "stranger" who was sitting at the bar had been there since 12:15 A.M. Cady also admitted that he used a knife to cut up or

chip rocks of crack cocaine on the night in question after previously denying it. Cady further admitted that if he ordered beer to go, it would have been a six-pack of "Bud light."

Watson's boyfriend, Jerry Dockum, testified that he received a call from the victim on the night in question and was told that she was closing early at about 1:30 A.M. At about 2:00 A.M., Dockum became concerned about her whereabouts and called the bar. When no one answered the phone, Dockum called his sister, Gloria Loring. According to Dockum, Watson never removed the cash drawer from the cash register in the presence of people whom she did not know. Dockum further testified that he had been present on one previous occasion when Watson, in Cady's presence, removed the cash drawer in the bar and took it downstairs. Dockum also testified that he had never seen defendant at the bar.

According to Maria Coller, a former employee of Barney's, she received a call from Loring after Dockum had called his sister. Maria Coller, who had keys to the bar, and her husband, Ron Coller, then picked up Loring, and they went to Barney's, finding it unusual that the lights were on. In addition, Watson's car was in the parking lot behind the bar, although the outside doors were locked. According to Mr. Coller, they arrived at the bar at approximately 5:30 A.M. on March 22. Upon entering through the side door of the bar, Mr. Coller almost tripped on a six-pack of Budweiser beer in a Michelob pack left on the floor with a napkin on top of it. The television was blaring, and Watson's purse was on the back of the bar. After calling the bar owners and 911, the Collers noticed a knife behind the bar where the glasses

were washed. On the back of a chair was the victim's coat. The Collers also found a note for a take-out order of beer on the cash register behind the bar. After Mr. Coller opened the door to the basement and observed loose cash at the bottom of the basement stairs, his wife called 911 a second time. Going downstairs, the Collers walked all over the basement, looking for the victim. When they discovered that the door to the basement office was closed, Mrs. Coller called 911 a third time at about 6:00 A.M.

Shortly thereafter, Tom Bliler, one of the bar's owners, arrived at the bar and helped Mr. Coller open the door to the office, where they found the victim's body. According to Bliler, $1,009 had been stolen from the safe. Bliler also testified that he had never seen the knife that was found behind the bar and that the knife did not belong to the bar.

Officer John Hancotte, who, at the time of the offenses, was employed by the Bedford Township Police Department, was the first police officer to arrive on the scene at 6:25 A.M. on March 22, 1995. Upon finding that the victim had been dead for some time, Officer Hancotte called for additional help from the Battle Creek Police Department and the Michigan State Police. Reporting to the crime scene were Detective Michael VanStratton, the crime lab supervisor of the Battle Creek Police Department at the time of the murder, who was employed by the Kansas Bureau of Investigations at the time of trial, and State Trooper Harry O. Zimmerman, a crime-scene technician with the Michigan State Police, who was retired at the time of trial.

Detective VanStratton, who was qualified as an expert witness in the areas of bloodstain-pattern anal-

ysis, latent-fingerprint analysis, and crime-scene reconstruction, arrived at Barney's at approximately 7:00 A.M. on March 22, 1995, and determined that his personnel did not have the necessary equipment to process the crime scene. After going back to the Battle Creek Police Department to retrieve additional equipment, Detective VanStratton returned to Barney's but found that "some of the areas which we thought might be critical for investigation had already been occupied by people that came in that morning," including bar employees, and that "[c]offee was being made behind the bar." Detective VanStratton testified that because "there was some important evidence behind the bar," it was the first area that was isolated.

According to Detective VanStratton, the crime-scene technicians began collecting evidence upstairs in the bar, finding a bloodstained napkin stuck inside a six-pack of beer, a knife and diluted bloodstains on the stainless steel sink area directly behind the bar, the victim's purse, two drinking glasses, a cash register receipt, and "a small piece of paper that had to go with five dollars beer to go, a price of $5.10," which "were in the immediate area behind the bar." Detective VanStratton testified that the crime-scene technicians proceeded downstairs to the basement office where the victim's body was found. Scattered on the floor in front of the basement office door were seven $5 bills, which were collected as evidence. The crime-scene technicians also collected a bloodstain that was found on the plasterboard wall at the bottom of the stairs, along with a piece of the wall containing what appeared to be knife punctures.

Detective VanStratton testified that when he entered the basement office, the victim was found on

her back, with bloodstains smeared across her abdomen and "some stab wounds to the chest area." In Detective VanStratton's opinion, it was apparent that a struggle had taken place given the disarray in the office and the scrapes that were found on the victim's arms. Detective VanStratton further testified that there was an excessive amount of blood on the victim's body, "particularly her neck area and chest area." In Detective VanStratton's opinion, the victim's assailant would also have had blood on his or her hands and possibly on his or her clothing because the victim's bloodstains were transferred to the assailant. According to Detective VanStratton, "we did find some blood transfer on the napkin that was found upstairs." Detective VanStratton also testified that three identifiable prints were found on the cash box, one belonging to the victim and the other two to the bar's owner, but that the police were not able to develop fingerprints from the other crime-scene evidence.

On cross-examination, Detective VanStratton testified that he first arrived at the bar shortly after 7:00 A.M. on March 22, 1995, and returned to it after 8:00 A.M. When he returned to the bar, there were a number of people inside, including the victim's friends and bar employees. In his testimony, Detective VanStratton agreed with Officer Hancotte's estimate that there were about seven people in the bar at that time who were not law-enforcement people. According to Detective VanStratton, people were mingling in the area where the knife, the bloodstains on the sink, and the bloodstained napkin on the six-pack of beer were found. Although people were drinking coffee in this area of the bar, Detective VanStratton did not see

anybody eating. Detective VanStratton also testified that because the bloodstains on the sink were diluted, "[t]here's no way to tell if it was fresh or not fresh," in determining how long the bloodstains had been present. Detective VanStratton further testified that blood had been transferred from the victim to the assailant during the physical struggle in the basement office, but he refused to speculate whether there was more than one assailant.

According to Dr. Stephan Cohle, who was qualified as a forensic pathologist, the victim suffered both "blunt force injury" and "sharp force injury." The blunt-force injuries consisted of scrapes and bruises, while the sharp-force injuries were "primarily stab wounds." Dr. Cohle testified that the victim suffered "a total of six stab wounds, four in the chest, two in the back." Dr. Cohle opined that "[t]he cause of death was [a] stab wound in the chest," which extended into the heart, causing massive bleeding.

George Bliler, the son of one of Barney's owners, also testified for the prosecution. According to George Bliler, Cady arrived at the bar between 8:00 and 9:30 A.M. on March 22, 1995, curious about why all the police were present, but departed after only a few minutes.

Officer Brad Wise, who was employed by the Bedford Township Police Department at the time of the offenses, testified that Cady approached him in the afternoon of March 22 and gave him a description of the white male customer in his thirties whom Cady claimed to have seen the night before when he entered the bar. Officer Wise subsequently interviewed defendant twice about the case, the first time by telephone and the second in person. During the

second interview on May 3, 1995, defendant told Officer Wise that Cady came to her house at 11:00 P.M. on March 21, 1995, to drink alcohol and smoke crack cocaine. According to Officer Wise, defendant told him that Cady then left to cash a check and returned with $50, which they used to purchase more crack cocaine. According to Officer Wise, defendant told him that she and Cady left her mother's home at about 3:00 A.M. after her mother complained that they were making too much noise. Defendant also told Officer Wise that she had not been to Barney's for five or six years.

On cross-examination, Officer Wise acknowledged that Cady assisted the police in preparing a composite sketch of the man whom he claimed was in the bar on the night in question. Officer Wise also acknowledged that after the homicide and robbery, he talked with Dennis Fodor, who originally corroborated Cady's description of the other man in the bar. Officer Wise admitted that after talking to Fodor, he reported that Fodor gave a description of the other man in the bar as looking like Cady. However, Officer Wise disputed whether Fodor's statement corroborated Cady's description of the other man. Officer Wise testified that although Fodor originally stated that he was in the bar until closing time, "the second time I talked to Mr. Fodor he indicated that he was there 'till last call, which was eleven o'clock." Officer Wise, however, explained that "[Fodor] said that it was his last call" because he had had too much to drink by that point, and "the bartender cut him off."

Thereafter, in the middle of May 1995, Detective David Walters of the Battle Creek Police Department was assigned to the case and, after reviewing the case

file and talking with Officer Wise, decided to focus his investigation on Robert Cady, his wife Jennifer Cady, Dion Paav, and defendant. On May 24, 1995, Detective Walters interrogated defendant at the Battle Creek Police Department and showed her a photograph of the knife that was recovered at crime scene. According to Detective Walters, defendant recognized that it was her knife because she had altered "the blade end of the knife" to make it easier "to clean up her crack pipes." However, during the interview, defendant gave no indication that she had been at Barney's during the early morning hours of March 22, 1995.[2]

Detective Walters then interviewed Paav and Jennifer Cady on May 25, 1995, but neither one provided much direction to his investigation. However, after interviewing Robert Cady on May 26, 1995, Detective Walters began to concentrate his attention on Cady as the principal suspect in this case, meeting him in the parking lot of Barney's for a second interview on June 2, 1995. According to Detective Walters, when they approached one another in the parking lot, Cady was wearing sunglasses, even though it was "a dark, dreary day," and "he was visibly shaking, like his body was shaking, his hands were shaking." While inside the bar, Cady acknowledged in response to Detective Walters' questioning that he knew that the safe was kept in the basement of the bar, although he

_____

[2] There is no indication in the trial transcript whether defendant was ever advised of her rights under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), before she was questioned by Detective Walters in this case. We also note that defense counsel never raised the *Miranda* issue in the lower court, nor questioned Detective Walters whether defendant was advised of her *Miranda* rights.

did not know where the entrance to the basement was in the bar.

Subsequently, on June 7, 1995, Detective Walters, accompanied by Detective David Adams of the Battle Creek Police Department, questioned defendant once again about the homicide that occurred at Barney's on March 22, 1995. During the interview, which took place in a police car, Detective Walters showed defendant a photograph of the knife that was found in the bar. According to Detective Walters, defendant acknowledged that it was her knife, indicating that she had used it at her mother's residence where she lived. Detective Walters further testified that defendant indicated that her fingerprints or those of Paav, who lived at the same residence, would be on the knife because "they had both handled the knife" about "three to four weeks prior to the homicide."

Detective Walters also testified that, during the June 7, 1995, interview, defendant admitted that she accompanied Cady to Barney's after 1:00 A.M. on March 22, 1995. According to Detective Walters, defendant stated that she stayed in the vehicle, while Cady went inside the bar to cash a check, and that there were a couple of cars in the parking lot at the time. Detective Walters testified that defendant stated that after leaving Barney's at approximately 1:30 A.M., she and Cady then went to various other establishments that night to cash a check and buy beer before stopping to purchase some crack cocaine. When Detective Walters questioned defendant about whether she might have been responsible for killing the victim, she shook her head in denial. When questioned about the circumstances under which she might commit such a homicide, Detective Walters

reported that defendant said that "if that bitch had treated her bad she would do something to that effect." Detective Walters further testified that "Defendant said that the person that would have been responsible for this would have been [sic] blood on them and that Rob—meaning Rob Cady—didn't have any blood on him. And she said what would she have done with the bloody clothes. I think she also said to the effect the person would have had—the victim was moved to the basement so the person would have had to have blood on them that did that."

On cross-examination, Detective Walters, who, at the time of trial, was retired from the Battle Creek Police Department after twenty years of service, acknowledged that, at some point during his two-month investigation into the homicide and robbery, the police conducted a search of defendant's residence with her consent and seized her clothes, including her purple jogging suit and nightgown, for any "trace evidence," such as blood and hair fibers, to determine whether they matched the blood and hair fibers that had been found at the crime scene. Detective Walters indicated that the hair and fiber comparison did not reveal any match. The police also searched Cady's residence with his consent, seizing some articles of his clothing. Cady's car was also searched on May 26, 1995, but the police found no blood or hair evidence linking him to the crime. Although Paav's residence was not searched, the police searched his vehicle, but again found nothing linking Paav to the crime.

In response to defense counsel's questioning about the interrogation conducted on May 24, 1995, at the Battle Creek Police Department, Detective Walters

admitted that he experienced "some problems with the audio-visual equipment" that was used to record the interview. Specifically, during the interview, Detective Walters discovered that "[t]he equipment was not working properly," and that at some point the audio started to work properly again, but not the video, which apparently never worked throughout the interrogation. As a result, only about one-half of the lengthy interrogation was audiotaped. A thirty-two-page transcript of the audiotaped portion of the interrogation was thereafter prepared. However, Detective Walters admitted that he had never listened to the audiotape in order to compare it with the transcript that was prepared of the May 24, 1995, interrogation. Detective Walters further admitted that defendant's articulation was "rough at times" and that she was difficult to understand. As a result, there were 261 "inaudibles" in the thirty-two-page transcript, which Detective Walters admitted was a surprisingly high number for a transcript of this length.

Although Detective Walters testified on direct examination that defendant stated in the interrogation at the police station on May 24, 1995, "[t]hat the knife was hers" and that "she recognized the knife by the point on it," he conceded on cross-examination that while she stated that "it looks like one of my knives," her answer to the question whether it was "one of your knives" was transcribed as her "saying no." In addition, defendant's other answers to his questions about the knife were inaudible. Notwithstanding, Detective Walters stood by his testimony given in direct examination that defendant admitted that the knife was hers. Detective Walters acknowledged that despite the high number of inaudibles in the tran-

script of the May 24, 1995, interrogation, he did not
send the tape to the Michigan State Police Crime Lab-
oratory to enhance the sound quality.

Detective Walters also acknowledged that at 1:10
A.M. on March 22, 1995, "officially, there was a report
of a pickup truck style vehicle being seen leaving the
area." According to Detective Walters, the pickup
truck was "possibly a light colored pickup" with "[a]
homemade box with a box or wooden frame in the
back." Detective Walters testified that the police
investigated this information, but did not find a
pickup truck that matched the description of the
vehicle.

On cross-examination, Detective Walters conceded
that the police had no direct evidence that defendant
was in the basement of Barney's at the time of the
murder. Detective Walters also acknowledged that
while Cady and Paav were suspects, they were not
charged in this case. Further, while Detective Walters
admitted that defendant never told him that the knife
found in the bar belonged to Paav, he conceded that
he told Paav during an interview on June 7, 1995, that
defendant said that the knife was his. Detective Wal-
ters admitted that he lied to Paav because he wanted
"to see if [he] was telling [] the truth." Detective Wal-
ters also admitted that he lied to defendant when he
told her during an interview that her fingerprints
were on the knife. Detective Walters further admitted
that defendant denied going with Cady to cash a
check at Barney's on the night in question and also
denied being in the bar that night.

Dion Paav testified that he knew the victim as a
bartender at Barney's and found out about her death
on the morning of March 22, 1995, when a cook at

Barney's called to tell him that she had been mur-
dered. Paav, then forty-five years old, testified that he
had been friends with Cady since he was ten years
old. Paav testified that he planned on meeting Cady at
Barney's on the evening of March 21, 1995, because
both of them lived near Barney's, where they were
regular customers. However, after getting off work at
4:00 P.M., Paav went straight home and did not go to
Barney's. Paav testified that he did not receive a call
from Cady or anyone else that night. Paav also testi-
fied that he could not recall telling Detective Walters
about a telephone conversation that he had with
defendant while house-sitting for Cady after the mur-
der. However, when presented with a previous state-
ment he made to the police, Paav admitted that he
did have a conversation with defendant at some
point, although he claimed that he could barely
understand her and that she said something about fin-
gerprints and the knife.

On the final day of the trial, Detective Walters was
recalled by the prosecution and testified that Paav
told him that when he was house-sitting for Cady
over the Memorial Day weekend in 1995, he received
a telephone call from defendant. According to Wal-
ters, "[Paav] said that she thought the police had
found her fingerprints on the knife at Barney's and
also that the police had gotten her—taken her tennis
shoes."

The prosecution also called Megan Clement, an
employee of Laboratory Corporation of American
(LabCorp), a DNA-testing company based in North Car-
olina, who was qualified as an expert witness in DNA
and serological analyses. Clement testified that she
was unable to obtain DNA results from the blood

found on the sink behind the bar because there was
an insufficient amount of DNA from which to develop
a profile for the purpose of comparing it with defen-
dant's blood sample. According to Clement, she tested
six bloodstains from the victim's shirt and that "the
profile on all six strains were consistent with one
other, and all six stains were consistent with originat-
ing from the same individual; however, it could not
have been Ms. Tanner. Her profile was different than
the profile on these six stains." However, Clement did
not identify whose profile was contained on the six
bloodstains.

Clement also testified about the process of serolog-
ical testing, explaining that there are four common
blood types—A, B, AB, and O—and that there were
ten different types of the enzyme phospho-
glucomutase (PGM) found in human blood, thus per-
mitting subtyping with regard to blood type and PGM.
According to Clement, "if you type for ABO and PGM,
you look at the frequency of ABO times the frequency
[of] the PGM to come up with what percentage of the
population would have both of the characteristics in
the sample detected." Clement then explained:

> In the Caucasian population a type B blood is approxi-
> mately ten percent and a PGM two plus one plus is approxi-
> mately 20 percent, actually 21 percent. If you multiply the
> two for a person to have type B blood and be a two plus
> one plus it would be approximately two percent of the pop-
> ulation of the Caucasian population.

Clement added:

> In the African-American population a type B is much
> higher. It's approximately 20 percent. And the PGM two plus
> one plus is about 19.8 percent, so approximately 20 percent

as well. So a person who have [sic] blood type B and PGM two plus one plus in the African-American population would be approximately four percent so it would be twice as common in the African-American population as the Caucasian.

On cross-examination, Clement acknowledged that there was insufficient blood to obtain DNA results from the bloodstain that was found near the sink in the bar. In addition, Clement testified that the DNA analysis of the six bloodstains exculpated defendant. During cross-examination, defense counsel also questioned Clement about how many people in the United States have type B and PGM two plus one plus. In response, Clement stated that considering that African-Americans constituted twenty-six percent of the United States population of 280 million people, "26% of 280 million people times four percent of that" resulted in "[p]ossibly millions" matching this serological profile. Defendant is African-American.

Nibedita Mahanti, who was employed by the Michigan State Police, also testified as an expert witness in DNA analysis for the prosecution. Mahanti testified that she performed DNA analysis on blood samples from the victim, defendant, Cady, and Paav and from the evidence items that were submitted to her. In Mahanti's opinion, the DNA profile of the blood samples from the knife, the napkin, and a stained cloth matched the DNA profile of the victim. The DNA profile of the victim was also found on one napkin from the bar, a blood sample that was taken from next to the knife, and a section of cardboard from a box. The blood sample from the bar sink, however, had insufficient DNA to produce a reliable result. In addition, blood found on the section of the victim's shirt con-

tained the DNA profile of an unknown donor, because it was not contributed by the victim, defendant, Cady, or Paav. Defense counsel stipulated the admission of Mahanti's DNA report and moved, without objection, that Mahanti be recognized as an expert in DNA analysis.

The prosecution also called Marie Bard-Curtis to testify as an expert in the area of serology. Bard-Curtis, who was employed by the Michigan Department of State Police Forensic Science Division Microchem Subunit, testified that she performed serological testing on the following evidence items received from the Battle Creek Police Department: "a white folded paper packet identified as containing a sample from the bar sink"; "a control sample from that area"; "a sample from the bar top near the beer taps"; a "[s]ample from a napkin in a beer six pack"; "[a] sample from the bar and the sink next to the knife"; "[a] sample portion of wallboard with a blood stain"; "a portion of a box lid"; and blood samples of the victim whose first name was incorrectly recorded as Susan. Bard-Curtis also obtained ABO blood typing for the victim, defendant, Cady, and Paav, as well as PGM typing of the blood of the victim and defendant.

Bard-Curtis testified that the victim had blood type B and PGM subtype of 2+, 1–, while defendant had the blood type B and PGM subtype of 2+, 1+. Cady and Paav both had blood type A. The samples from the bar top, the bar and sink next to the knife, the wallboard and cardboard box were tested and showed the presence of human blood, but insufficient protein was available to perform PGM subtyping. Testing performed on the articles of clothing seized from defendant's residence did not disclose the presence of

human blood. However, with regard to the sample of blood taken from the bar sink that was found next to the knife, Bard-Curtis testified: "The ABO type determined on the blood on the bar sink was type B. Hattie Mae Tanner was blood type B. The PGM subtyping detected on the sample from the bar sink was two plus one plus and Hattie Mae Tanner was also two plus one plus."

On cross-examination, Bard-Curtis testified that no results were obtained from the control sample, indicating that contamination had not affected the results. However, Bard-Curtis admitted that she did not know if "whole blood samples" were submitted to her for analysis, and that it was possible that the bloodstains could have been the mixture of more than one person's blood. On redirect examination, Bard-Curtis clarified her testimony. Assuming that two individuals contributed to a blood sample, Bard-Curtis testified that both individuals would have to have type B blood if the result were a type B sample and both would also have the same PGM enzyme subtyping.

After the prosecution rested, defendant's first witness was Catherine Huskins, who testified that she knew the victim and that she and her husband informed the police that before the murder the victim had found a nonfolding knife and that the victim had told her husband that she was going to keep it in her purse. However, on cross-examination, Huskins, after being shown the knife, admitted that she had never seen the knife before.

Defendant next called Dale Crum, who worked at Barney's in 1995 and at the time of the trial. According to Crum, the door to the basement at Barney's

was kept shut but unlocked during business hours so that employees could access the basement for food and supplies.

Defendant also called her mother, Hattie Mae Tanner, to testify in her behalf. Mrs. Tanner testified that on the evening of March 21, 1995, defendant was home and that Cady, who was a frequent visitor to her house, was also present. According to Mrs. Tanner, Cady was sitting at her dining-room table drinking beer when she woke up in the morning. Mrs. Tanner did not see any blood on defendant's clothing.

Todd Green, whose family owns Green's Tavern, testified as a defense witness that Cady was at the bar for about fifteen minutes after midnight on March 22, 1995. Green testified that Cady, after cashing a check at the bar, drank a beer and made a telephone call before leaving.

Defendant testified in her own behalf that Cady was at her mother's house on March 22, 1995, and that they smoked crack cocaine together before Cady left to cash a check. According to defendant, Cady returned to her mother's house after cashing a check, but left again around 2:30 A.M. or 3:00 A.M. Defendant denied that she went anywhere with Cady that night except to purchase crack cocaine with him shortly after midnight. Specifically, defendant denied that she went with Cady to Barney's on the night in question, that she killed the victim, that the knife in question was hers, and that she told Detective Walters that the knife was hers. Defendant testified that she could not remember having ever gone to Barney's, although she acknowledged that Cady told her that she had been there once about ten years previously. According to defendant, any indication in the tape recording that

she told Detective Walters that she had been to Barney's a couple of times was incorrect. As for the knife, defendant testified that when she was questioned by Detective Walters at the police station, "I told him yes, [it] looked like a knife I used to have. I asked him did it bend or fold. He said no. I said it couldn't have been my knife because it's not allowed on the job, straight bladed knife." Defendant also denied giving any statement to Detective Walters in his police car on June 7, 1995.

Defendant also called Kevin Sage, who testified that while passing by Barney's between 1:15 and 1:25 A.M. on March 22, 1995, he saw "a light colored truck with a pickup—or a wooden cap on it" that "looked like . . . a house." According to Sage, he saw "a driver that looked white, Caucasian with a beard and there was a passenger."

Defendant's final witness was Nancy Chantrene, who testified that at 2:47 A.M. on March 22, 1995, she passed Barney's en route to work at the post office when she noticed that the outside sign was on, which was unusual. According to Chantrene, a light colored truck "that had a cap on it" was parked along the west end of the bar.

I

On appeal, defendant first argues that the trial court erred in not conducting a pretrial hearing to determine if PGM blood typing complies with the *Davis-Frye* standard, adopted from *People v Davis*, 343 Mich 348; 72 NW2d 269 (1955), and *Frye v United States*, 54 US App DC 46; 293 F 1013 (1923), which requires that novel scientific methods must be shown

to have gained general acceptance in the scientific community to which they belong before being admitted as evidence at trial.[3] *People v Young*, 418 Mich 1, 17-19; 340 NW2d 805 (1983) (*Young I*) (*After Remand*), 425 Mich 470; 391 NW2d 270 (1986) (*Young II*); *People v Adams*, 195 Mich App 267, 269; 489 NW2d 192 (1992), mod on other grounds 441 Mich 916 (1993). Although defendant questioned whether the prosecution's expert witnesses possessed expertise in population genetics to opine on the statistical probability of blood-type results, she did not specifically challenge the scientific acceptance of electrophoresis to identify blood types or PGM markers. Therefore, defendant failed to preserve her claim that a *Davis-Frye* hearing was necessary. MRE 103(a)(1); *People v Kilbourn*, 454 Mich 677, 684-685; 563 NW2d 669 (1997). Unpreserved evidentiary error is reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999); *People v Herndon*, 246 Mich App 371, 404; 633 NW2d 376 (2001).

In this case, defendant relies on *Young I*, which held that the trial court erred in not holding a *Davis-*

---

[3] In *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 587, 593-594; 113 S Ct 2786; 125 L Ed 2d 469 (1993), the United States Supreme Court, rejecting the more stringent *Frye* test of "general acceptance within the scientific community," held that the admissibility of scientific evidence is primarily controlled by Rule 702 of the Federal Rules of Evidence. In determining whether the proposed scientific opinion is sufficiently reliable for jury consideration under *Daubert*, a trial court must determine whether "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert, supra* at 592. Under *Daubert*, the evidentiary reliability of the proposed expert testimony is based upon scientific validity. *Id.* at 590, 592-595. However, we are bound to follow the *Davis-Frye* standard until such time as the standard is modified by our Supreme Court. *Boyd v W G Wade Shows*, 443 Mich 515, 523; 505 NW2d 544 (1993).

*Frye* hearing to determine the admissibility of the then-novel technique of serological electrophoresis. In *Young I*, the Court remanded for an evidentiary hearing in the trial court "to determine whether the results of serological electrophoresis have achieved general scientific acceptance for reliability among impartial and disinterested experts." *Young I, supra*, 418 Mich 25. Defendant also relies on *Young II*, which held that the prosecution had not established by disinterested experts that thin-gel electrophoresis of dried bloodstains was generally accepted in the relevant field. *Young II, supra*, 425 Mich 475, 481-485, 495.

Defendant's reliance on *Young I* and *Young II* to establish plain error in the present case is misplaced. First, our Supreme Court recognized the general acceptance in the scientific community of serological electrophoresis and the acceptance in the scientific community of the general validity of genetic-typing tests. *Young II, supra*, 425 Mich 486, 499.

Defendant's argument also fails because the proponent of scientific evidence that has already been judicially recognized as generally accepted in the relevant scientific community is not required to meet the *Davis-Frye* standard. *People v Haywood*, 209 Mich App 217, 221-224; 530 NW2d 497 (1995); *United States v Downing*, 753 F2d 1224, 1234 (CA 3, 1985). After *Young II*, this Court twice held that singe-test serological electrophoresis to identify PGM markers is generally accepted as reliable in the relevant scientific community. See *People v Gistover*, 189 Mich App 44, 48, 53-54; 472 NW2d 27 (1991) (recognizing the general acceptance of electrophoresis); *People v Stoughton*, 185 Mich App 219, 229; 460 NW2d 591 (1990)

(noting that "the single system method of electrophoresis has been accepted by the relevant scientific community and is not subject to the independent validation requirement of *Young II*").

Finally, we note that in *People v Carines,* unpublished opinion per curiam of the Court of Appeals, issued April 25, 1997 (Docket No. 182792), which was affirmed by our Supreme Court in *Carines, supra* at 753, this Court followed *Gistover* and *Stoughton,* holding that the admission of evidence of single-system electrophoresis of dried bloodstains for two genetic markers, PGM and EAP, was not plain error. In affirming this Court's decision in *Carines,* the Supreme Court indirectly approved *Gistover* and *Stoughton* when it held that the prosecution had presented sufficient evidence of the defendant's guilt, including key inculpatory bloodstain evidence derived from electrophoresis. *Carines, supra* at 758, 761, 772.

II

Next, defendant argues that the trial court denied her due process by not appointing a DNA expert or a serology expert to assist her defense. Specifically, defendant argues that, as an indigent, she was entitled to such expert assistance in order to respond to the trial testimony of the prosecution's expert witnesses who were qualified in the areas of DNA analysis and serology.[4] We review for an abuse of discretion a trial court's decision denying a motion to appoint an

---

[4] Defendant also claims on appeal that the trial court erred in denying her motion for funds to retain a serological expert to assist appellate counsel, which was raised in her motion for a new trial. Because we hold that the trial court erred in denying defendant's motion for expert assistance at trial, we need not address this issue.

expert witness for an indigent defendant at public expense. *Herndon, supra* at 398.

A

The issue concerning the appointment of an expert witness for an indigent defendant was addressed by this Court in *People v Leonard*, 224 Mich App 569, 580; 569 NW2d 663 (1997). In that case, the prosecution argued that the trial court abused its discretion in granting a new trial to the defendant on the basis that the defendant did not have a DNA expert at trial. In *Leonard*, this Court, referencing the principles articulated in *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985), noted that "[u]nder the Due Process Clause, states may not condition the exercise of basic trial and appeal rights on a defendant's ability to pay for such rights." *Leonard, supra* at 580. This Court in *Leonard* added that while indigent defendants are not entitled to "all the assistance that wealthier defendants might buy, [] fundamental fairness requires that the state not deny them ' "an adequate opportunity to present their claims fairly within the adversary system." ' " *Id.*, quoting *Moore v Kemp*, 809 F2d 702, 709 (CA 11, 1987), quoting *Ross v Moffitt*, 417 US 600, 612; 94 S Ct 2437; 41 L Ed 2d 341 (1974). However, the *Leonard* Court, after reviewing the case law from other jurisdictions, pointed out:

"[A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather, a fair reading of these precedents is that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assis-

tance to the defense and that denial of expert assistance
would result in a fundamentally unfair trial." [*Leonard*,
*supra* at 582, quoting *Moore, supra* at 712.]

Thus, this Court in *Leonard, supra* at 582, held:

[C]onsistent with the majority of courts, other than psy-
chiatric experts, a defendant is entitled to the appointment
of an expert at public expense only if he cannot otherwise
proceed safely to trial without the expert. MCL 775.15; MSA
28.1252. In other words, a defendant must show a nexus
between the facts of the case and the need for an expert.
*People v Jacobsen*, 448 Mich 639, 641; 532 NW2d 838 (1995).

Applying these principles, the *Leonard* Court found
that the trial court erred in granting the defendant a
new trial on the basis that the defendant was entitled
to a DNA expert. Specifically, *Leonard* held that the
trial court erred in finding that the defendant was
entitled to a DNA expert simply because DNA evidence
was being offered against him. However, even assum-
ing that the defendant was erroneously deprived of a
DNA expert, *Leonard* stated that any error by defense
counsel or the trial court in depriving an indigent
defendant of the appointment of an expert is grounds
for reversal only "if [the] defendant was prejudiced
and received a fundamentally unfair trial as the result
of not having expert assistance." *Leonard, supra* at
583, citing *People v Mateo*, 453 Mich 203, 214-215; 551
NW2d 891 (1996), *People v Pickens*, 446 Mich 298; 521
NW2d 797 (1994), and *People v Young (After
Remand)*, 425 Mich 470, 501; 391 NW2d 270 (1986).
Because the *Leonard* Court concluded that the defen-
dant was not denied due process by the lack of a DNA
expert, it did not address whether the defendant was
prejudiced.

In this case, defendant contends that she was denied her federal right to due process when her pretrial motion for the appointment of expert witnesses in the areas of DNA and serology was denied. Specifically, defendant sought the procurement and testimony of expert witnesses in order to respond to the prosecution's contention that the bloodstain that was found on the sink behind the bar implicated her in the felony murder. While the procedural posture of this case, which involves a pretrial motion for appointment of expert witnesses at public expense, is different than *Leonard*, which involved the grant of a new trial on the basis that the defendant was entitled to a DNA expert at trial, we nonetheless apply the principles set forth in *Leonard* in analyzing whether defendant was erroneously deprived of the appointment of expert witnesses in DNA and serology at trial. To determine whether defendant is entitled to such expert assistance we first consider whether she could otherwise proceed safely to trial without these experts. If defendant could not do so, we then consider whether she was prejudiced and received a fundamentally unfair trial as the result of not having expert assistance. If defendant was so prejudiced, then reversal of her convictions and the sentence for the felony-murder conviction is required.

In determining whether reversal is required, we note that the *Leonard* Court erred in referencing the harmless-error standard for nonconstitutional error as set forth in *Mateo, supra* at 203.[5] Because the claimed

---

[5] As for the harmless-error standard, *Leonard* is not binding under MCR 7.215(I)(1) because it did not establish a rule of law on this point since its discussion of the harmless-error standard was mere obiter dictum. See *Sumner v Gen Motors Corp (On Remand)*, 245 Mich App 653,

error concerns an alleged violation of the federal constitution, we must apply the federal harmless-error standard. *People v Anderson (After Remand)*, 446 Mich 392, 404; 521 NW2d 538 (1994), citing *Chapman v California*, 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705 (1967), and *Arizona v Fulminante*, 499 US 279; 111 S Ct 1246; 113 L Ed 2d 302 (1991).[6] Under the federal harmless-error standard, the question is whether the claimed federal constitutional error constitutes a structural defect in the trial that defies harmless-error analysis so as to require automatic reversal or whether it amounts to a trial error occurring in the presentation of the case " 'and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.' " *Anderson, supra* at 405-406, quoting *Fulminante, supra* at 307-308; see also *People v Solomon (Amended Opinion)*, 220 Mich App 527, 535; 560 NW2d 651 (1996). Under the standard stated in *Chapman*, the prosecutor must prove beyond a reasonable doubt that the constitutional error did not contribute to the guilty verdict.

In this case, the alleged constitutional error is not a structural error that infects the entire trial mechanism; rather, it should be classified as a trial error occurring in the presentation of the case. In support, we rely upon *State v Scott*, 33 SW3d 746, 755 n 6 (Tenn, 2000), where the Supreme Court of Tennessee,

---

661; 633 NW2d 1 (2001); *People v Petros*, 198 Mich App 401, 406 n 3; 499 NW2d 784 (1993).

[6] The dissent, citing MCR 2.613(A), MCL 769.26, and *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999), mistakenly references the harmless-error standard for preserved, *nonconstitutional* error.

in reversing an indigent defendant's convictions of
rape and aggravated assault, held that the failure to
provide the defendant with state-funded expert assis-
tance in the area of DNA analysis was "a trial error and
properly subject to constitutional harmless error anal-
ysis." *Id.* In *Scott,* the Supreme Court of Tennessee
found that the indigent defendant had demonstrated a
"particularized need" for expert assistance, finding
that "[b]ecause the identity of the offender was the
only real issue at trial and because the jury's conclu-
sion as to the weight of the DNA evidence may have
been conclusive as to its determination of the appel-
lant's guilt, expert assistance in DNA analysis may have
been crucial to a successful defense." *Id.* at 754. How-
ever, because the denial of needed expert assistance
did not affect the " 'entire conduct of the trial from
beginning to end,' " the *Scott* Court concluded that it
was a trial error. *Id.* at 755 n 6. We likewise apply the
harmless-error standard under the federal constitu-
tion for trial error in determining whether the alleged
constitutional error in this case was harmless beyond
a reasonable doubt. But see *Rey v State,* 897 SW2d
333, 345-346 (Tex Crim App, 1995) (ruling on the basis
of the reasoning expressed in *Ake, supra,* that depriv-
ing an indigent defendant of the necessary expert
assistance amounted to a structural defect in the trial
that defied harmless-error analysis).

B

On October 9, 2000, the trial court held a hearing
on defendant's motion for expert assistance. Defense
counsel did not call any witnesses at the hearing and
requested expert assistance because "[o]ne of the
important prongs of [the prosecution's] theory against

the defendant relates to this blood evidence," arguing that "due process really requires that I be able to explore this to a minimal degree." When questioned by the trial court, defense counsel indicated that expert assistance was necessary to assist him in understanding the nature of the DNA and blood evidence being presented by the prosecution so as to defend his client against the charges. The following colloquy ensued.

> *The Court*: Can't you do that through your cross-examination of the DNA person that the People bring?
>
> *Mr. Sullivan* [*defense counsel*]: Imagine if the government had to—the only way they could prepare their case and be informed and develop their defense or their government's strategy is to wait for the defense witness to take the stand and cross them to learn. I'm not asking for a lot of money, Judge. I would think most of the DNA experts wouldn't charge very much for an indigent defendant.
>
> *The Court*: Well, I beg to differ with you, Mr. Sullivan. That's a fairly sophisticated area of expertise.
>
> *Mr. Sullivan*: I'm not asking that there be reanalysis, Judge. I'm just asking for consultation with them about what these results would mean to them. I'm not asking for them to analyze blood, any of that. I'm not—I'm not asking for money for lab work or anything like that.
>
> *The Court*: You only want to consult with someone and have them review what the People have?
>
> *Mr. Sullivan*: Yes.
>
> *The Court*: And be able to talk with them, is that it?
>
> *Mr. Sullivan*: Then—Right, and then based upon the conversation that I would have, maybe call them as a witness for the defense.
>
> *The Court*: That opens a door to a lot more money, Mr. Sullivan. Mr. Kabot, what's your position as it relates to this request?
>
> *Mr. Kabot* [*assistant prosecutor*]: My position is this, Judge—and Mr. Sullivan knows this full well—the blood

stain that was on the sink upstairs in the bar, that was tested for serology. There is a breakdown of that—of that blood along with the blood samples that were submitted by a number of other people, because again they were tested serologically to see—they were tested for PGM enzymes and there is a breakdown. And as Mr. Sullivan knows[,] the report came back indicated that Ms. Hattie—Ms. Tanner's blood was included within the specified group that could have been a donor of that blood. DNA-wise there really isn't anything that links this defendant to anything that was found in that bar through DNA.

*The Court*: Even in the basement?

*Mr. Kabot*: Even in the basement and I think Mr. Sullivan understands that also. That what we're talking about in the basement and the blood in the basement every report that we received back where DNA was performed excluded Hattie Tanner.

*The Court*: So the point—I took it from Mr. Sullivan's argument we were going in a different direction—at this point in time the only thing you have apparently that by inference would link Ms. Tanner to the crime scene is she has the same blood type as was found on the stain in the kitchen and there is nothing in the basement in terms of the DNA analysis that at all links Hattie Tanner to that scene, is that it, Mr. Kabot?

*Mr. Kabot*: That's my understanding, Judge. Now understand I just got this case the other day and I had it at home over the weekend and I was reading it. But from each of the reports that we received back—forensic reports concerning DNA I saw on each of those that Ms. Tanner was excluded by way of DNA as being the donor for whatever blood sample they were testing.

*The Court*: Would you even call this person [sic] as a prosecution witness then?

*Mr. Kabot*: The only thing that I'm going to do, your Honor, as far as Megan Clements [sic] is concerned or anyone else as far as DNA is concerned is—there are some questions I have to ask them, but I mean as far as Mr. Sullivan's cross-examination of them I'm not sure how much there'll even be for the DNA people because again the bottom line is

the results of the testing says right there. You know, Hattie Tanner's excluded from being the donor of blood on the victim's clothing and the blood stains that they recovered in the immediate area of the victim's body which was in the basement. So how much cross-examination is there really going to be concerning that issue, only Mr. Sullivan knows.

*The Court*: Mr. Sullivan.

*Mr. Sullivan*: Can I offer a middle position here?

*The Court*: Sure.

*Mr. Sullivan*: How you [sic] about you approve enough money to me to consult the DNA expert, and then based on that consultation if I can persuade you that some money should be kicked in for him to testify then we can revisit that area, and that wouldn't put off the trial.

*The Court*: Well, Mr. Sullivan, the thing that occurs to me is that—and I'm not saying this would happen—but potentially you would confer with this expert and that expert would say I think the prosecution's expert is all wrong, it really doesn't link the defendant with the blood in the basement. Why do you need someone when you already have the prosecution witnesses saying it excludes your client?

Because the trial court concluded that "the prosecution's expert would exonerate and exculpate the defendant from the evidence found at the scene," it denied defendant's request for funds to hire an expert witnesses in the areas of DNA and serology.

C

We believe that the trial court erred in depriving defendant of expert assistance in the areas of DNA and serology because she could not otherwise proceed safely to trial without such assistance.

Here, defendant was facing various charges, including felony murder, an offense punishable by life imprisonment without parole, the maximum penalty under law in the state of Michigan. Notwithstanding

the severity of the charges, the prosecution's case against defendant was quite tenuous. As the parties recognized at the motion hearing, the DNA evidence excluded defendant as a contributor to the DNA found on the evidence samples. Moreover, there was expert testimony at trial that the blood found on the victim's shirt contained the DNA profile of an unknown female. Even though the DNA evidence exculpated defendant, the prosecution's experts determined that the serological evidence linked her to the crime scene because her blood type and PGM subtype were the same as those on the diluted bloodstain found on the sink behind the bar. In fact, this bloodstain, as interpreted by the prosecution's expert witnesses, was the only physical evidence that linked defendant to the crime scene. Thus, the prosecution's case against defendant rested very heavily upon the serological analysis and testimony of the prosecution's expert witnesses.

Given the critical role of the DNA and blood evidence in this case, it was absolutely essential for defendant to have been provided with expert assistance in the areas of both DNA analysis and serology in order to have a meaningful opportunity in which to prepare her defense against the charges and to respond to the prosecution's three expert witnesses at trial. While the trial court suggested that defendant did not need a DNA expert because the DNA evidence was exculpatory to defendant, defense counsel rightly pointed out at the motion hearing that defendant nonetheless had the constitutional right to put on her own defense and not simply rely upon what the prosecution had developed in seeking to prove the charges against her. By having her own DNA expert, defendant would have been able to develop and argue

the point that the DNA evidence exculpated her. More-over, given the complex nature of DNA evidence, expert assistance was necessary to ensure that defendant was properly represented, especially since defense counsel acknowledged that the subject matter was beyond his understanding. Specifically, it was evident that expert assistance in DNA analysis was needed to enable defense counsel to cross-examine the prosecution's expert witnesses in an effective fashion. See *Scott, supra* at 754 (finding that expert assistance in the field of DNA evidence "was absolutely crucial to competent representation given that the subject matter was inordinately complex and beyond the common understanding of most attorneys" in a prosecution where there were "inconsistent results regarding the donor of the hair samples"). For these reasons, we do not believe that defendant could have safely proceeded to trial without the assistance of a DNA expert.

In addition, the trial court, in denying defendant's motion for funds to hire expert witnesses, ignored the fact that defendant also needed to have an expert witness in the area of serology. After all, it was the evidence presented by the prosecution's experts in serology, Megan Clement and Marie Bard-Curtis, that linked defendant to the crime scene on the basis of the fact that she could have been a donor of the blood that was found on the sink next to the bar. Without her own expert witness in serology, however, defendant had no means to defend herself against the effect of such inculpatory evidence or to diminish its force by explaining that it constituted an anomalous test result. *Id.* at 754 (finding that "expert assistance was especially needed to help determine whether the

samples were contaminated and why the appellant was apparently excluded as a donor in one test involving PCR analysis"). Considering the damaging nature of the prosecution's serological evidence, it was thus imperative in the context of this case that defendant be provided with an expert witness in serology as well as a DNA expert.

Under the factual circumstances of this case, defendant was prejudiced and received a fundamentally unfair trial as the result of not having expert assistance provided by the court. *Leonard, supra* at 583-584. Applying the appropriate harmless-error standard, we cannot say that the error was harmless beyond a reasonable doubt. Thus, we are compelled to reverse defendant's convictions and her sentence for the felony-murder conviction.

As already indicated, the key physical evidence presented by the prosecution was the drop of diluted blood that was found next to the sink, near the alleged murder weapon. Bard-Curtis, the prosecution's principal expert witness in serology, testified that the blood was consistent with defendant's blood type B and PGM type 2+, 1+. While this same drop of blood matched the victim's blood type, it was inconsistent with the victim's PGM type. The bloodstain was also inconsistent with the blood type of the two other suspects, Cady and Paav. Further, according to Clement, the prosecution's expert witness in the statistical application of serology, blood type B and PGM 2+, 1+ is found in about four percent of the African-American population. Thus, according to the prosecution, there was an apparently high likelihood that the diluted bloodstain that was found on the sink

behind the bar came from defendant, an African-American.

The only other significant evidence adduced by the prosecution in support of defendant's conviction of felony murder was based upon Detective Walters' testimony regarding defendant's statements to him under questioning. First, Detective Walters testified that defendant, in two different statements, identified the knife found behind the bar as belonging to her on the basis of the chipped tip of the blade. Second, Detective Walters testified that defendant stated in the interview conducted in a police car on June 7, 1995, that she went with Cady to Barney's on the night in question but stayed in the parked car. Detective Walters also testified that defendant told him that her fingerprints might be on the knife. In addition, Detective Walters testified that defendant, in an answer to a hypothetical question whether there might be circumstances in which she would have committed the crime, stated that, "If that bitch had treated her bad she would do something to that effect."

However, at trial, defense counsel sought to undermine the credibility of Detective Walters. Specifically, Detective Walters acknowledged that when he interrogated defendant at the Battle Creek Police Department on May 24, 1995, the audiovisual equipment malfunctioned and that only about one-half of the extensive interrogation was audiotaped. Moreover, there were 261 "inaudibles" in the thirty-two-page transcript that was prepared about the recorded portion of the interrogation. Despite the admittedly high number of inaudibles, Detective Walters never listened to the tape in an attempt to increase the accuracy of the transcript, nor did he dispatch the tape to the Michi-

gan State Police to improve the sound quality. Significantly, although Detective Walters claimed in his direct testimony that defendant stated "[t]hat the knife was hers," he admitted during cross-examination that defendant's answer to the question whether it was "one of her knives" was transcribed as her "saying no." Moreover, we also note that defendant's alleged statements to Detective Walters on June 7, 1995, took place in a police car, apparently in the presence of another officer, Detective Adams, and were not recorded. We further note that Detective Adams did not testify at trial.

Thus, with the exception of the prosecution witnesses' expert testimony regarding the diluted bloodstain that was found near the sink next to the knife, there was no physical evidence that placed defendant at the crime scene. In this regard, we note that Cady, testifying as a prosecution witness, did not place defendant at Barney's on the night in question. Further, defendant denied that she went with Cady to Barney's on the night in question, that it was her knife that was used to kill the victim, and that she told Detective Walters that the knife was hers.

Considering the crucial importance of the blood-evidence testimony provided by the prosecution's expert witnesses at trial, it was thus fundamentally unfair for the trial court to have deprived defendant of expert assistance at trial because it was not beyond a reasonable doubt that a rational jury would have found her guilty if she had been provided with experts in the areas of DNA and serology. First, the DNA evidence exculpated defendant. Furthermore, of the blood samples tested, there was only one sample—the diluted bloodstain that was found near the

sink next to the knife—that possibly linked defendant to the crimes in question on the basis of the fact that she had the same blood type and PGM subtype as was found on this bloodstain. See *Scott, supra* at 755 (noting that "because the DNA evidence appears to have been the keystone of the State's case, an expert's assistance on the issues concerning the anomalous results of the various DNA tests could very well have made a difference in the preparation and presentation of the appellant's case or otherwise given rise to reasonable doubt in the minds of the jurors"). Further, when questioned, Clement, the prosecution's other serological expert, testified that about four percent of the African-American population had blood type B and PGM 2+, 1+.[7] However, this evidence only made it likely that the bloodstain came from defendant; it did not positively identify her as the donor. Thus, we cannot conclude that the prosecutor proved beyond a reasonable doubt that the constitutional error in question did not contribute to defendant's guilty verdict. *Chapman, supra.*

Moreover, it cannot be ruled out that someone other than defendant contributed the blood that was

---

[7] Clement also testified during cross-examination that because African-Americans constituted twenty-six percent of the population of the United States, there were "[p]ossibly millions" of people matching this serological profile. However, according to the United States Census Bureau, African-Americans constituted only 12.3 percent of the estimated United States population of 281 million people in 2000. See *http://quickfacts. census.gov/qfd/ states/00000.html.* While Clement's error in doubling the percentage of African-Americans in the United States population benefited defendant in this instance by increasing the number of individuals possessing this blood profile, it goes to show that defendant could not simply rely upon the accuracy of the prosecution's expert witnesses in presenting her defense to these charges. We also note that the blood samples of the victim that were submitted to the Michigan State Police for serological testing erroneously listed her first name as Susan.

found near the sink. As Detective VanStratton indicated at trial, the diluted bloodstain came from an area of the bar that was occupied by people, including bar employees and the victim's friends, where coffee was being prepared, until the area was isolated by the crime-scene technicians. Given that various people were mingling in an area considered "critical" to the police investigation before the evidence was collected, it cannot be excluded as beyond a reasonable doubt that the bloodstain came from someone other than defendant.

There was also evidence presented at trial raising a reasonable doubt whether the bloodstain in question was contributed by another individual who committed the homicide and robbery at Barney's. According to Cady's testimony, there was a white male customer in the bar when he entered Barney's at about 1:00 A.M. on March 22, 1995. Even discounting Cady's testimony as unreliable, defendant introduced the testimony of two other witnesses who claimed to have seen a pickup truck with a "wooden cap" parked at Barney's during the early morning hours of March 22. In addition, one witness, Kevin Sage, testified that he saw "a driver that looked white, Caucasian with a beard" together with a passenger in this vehicle. In this regard, defendant introduced a reasonable doubt whether someone else robbed and murdered the victim. In light of the evidence presented in this case, we therefore conclude that the trial court's error in depriving defendant of expert assistance in the areas of DNA and serology was not harmless beyond a reasonable doubt. Accordingly, we reverse defendant's

convictions and her sentence for the felony-murder conviction and remand for a new trial.[8]

III

Defendant also argues that the trial court erred in denying her motions to dismiss, claiming that the five-year delay between an initial police request for an arrest warrant and initiation of criminal charges by the prosecutor denied her due process. We disagree.

The trial court's decision whether to dismiss charges because of prearrest delay is reviewed for an abuse of discretion. *Herndon, supra* at 389. To the extent that the parties argue this issue as a matter of prosecutorial misconduct, the test is whether the defendant was denied a fair and impartial trial. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). Because the claim implicates constitutional due process, our review is de novo, *People v Cain*, 238 Mich App 95, 108; 605 NW2d 28 (1999), while the factual findings of the trial court are reviewed for clear error, MCR 2.613(C); *People v Pfaffle*, 246 Mich App 282, 288; 632 NW2d 162 (2001); *People v Adams*, 232 Mich App 128, 140; 591 NW2d 44 (1998).

---

[8] In addition, we note that while the trial court vacated defendant's sentences for her second-degree murder and armed robbery convictions, it apparently did not vacate these convictions as required under the doctrine of double jeopardy. US Const, Am V; Const 1963, art 1, § 15. However, the second-degree murder conviction must be vacated because the principles of double jeopardy prohibit multiple murder convictions for the death of a single victim. *People v Clark*, 243 Mich App 424, 429-430; 622 NW2d 344 (2000). Defendant's conviction of armed robbery must be vacated as well because convicting a defendant of both felony murder and the underlying felony violates the constitutional protections against double jeopardy. *People v Gimotty*, 216 Mich App 254, 259-260; 549 NW2d 39 (1996).

Defendant first moved to dismiss the charges before trial, alleging that the prearrest delay had prejudiced her because she lost the ability to gather evidence from the scene of the crime and locate potential witnesses, and that the delay had caused the memory of witnesses to fade. Following a pretrial hearing, the trial court denied the motion, ruling that the delay was occasioned by the prosecutor's need to conduct further investigation.

In addition, after the presentation of evidence at trial, defendant renewed her motion to dismiss, claiming that no additional investigation had been undertaken in the three to four years before the charges were brought against her. Defendant's due-process argument was based on the trial testimony of Detective Walters, whose requests for the issuance of arrest warrants for defendant, Dion Paav, and Robert Cady in July 1995 were denied by the prosecutor in the fall of that year. Detective Walters also testified that when a new prosecutor took office in 1997, he was promised a "fresh look," but a warrant for defendant was not authorized until the spring of 2000. According to the prosecution, however, laboratory work was still being performed on evidence in 1998 "with the hopes of getting additional evidence."

In denying the motion, the trial court ruled that defendant was not prejudiced by the delay because she had presented several witnesses whose memories were intact. The trial court also noted that the failure of the police officers to uncover additional inculpatory evidence during the delay did not negate the fact that they were performing their duties to investigate the case thoroughly. In the trial court's view, different

prosecutors might have simply viewed the sufficiency of the evidence differently.

The right to a speedy trial guaranteed by the Sixth Amendment does not apply to delay occurring before an arrest or initiation of a formal criminal charge, *United States v Marion*, 404 US 307, 320; 92 S Ct 455; 30 L Ed 2d 468 (1971), and the primary restraint on such delay is found in applicable limitation periods adopted by the Legislature, *id.* at 322. However, due process provides limited protection against oppressive prearrest delay. *United States v Lovasco*, 431 US 783, 789; 97 S Ct 2044; 52 L Ed 2d 752 (1977); *People v Bisard*, 114 Mich App 784, 788; 319 NW2d 670 (1982). To determine if due process is implicated, the court must balance the actual prejudice to the defendant against the state's reasons for the delay. *Lovasco*, *supra* at 790; *Cain*, *supra* at 108. Under this test, the defendant bears the initial burden to demonstrate prejudice and the burden then shifts to the prosecutor to explain the delay. *Id.* at 109; *Bisard*, *supra* at 790-791.

To establish a due-process violation meriting dismissal of the charges, a defendant must demonstrate both actual and substantial prejudice that impairs the defendant's right to a fair trial. *Adams*, *supra* at 134-135. Substantial prejudice is prejudice of a kind or sort that the defendant's ability to defend against the charges was so impaired that it likely affected the outcome of the trial. *Id.* at 135. Actual prejudice is not established by general allegations or speculative claims of faded memories, missing witnesses, or other lost evidence. *Cain*, *supra* at 109-110. Furthermore, a defendant must show that the prosecution intended to gain a tactical advantage by delaying formal

charges. *Marion, supra* at 324; *People v White,* 208 Mich App 126, 134; 527 NW2d 34 (1994).

In the present case, defendant has alleged only vague claims of faded memories and lost witnesses without specifically showing how these alleged deficiencies actually and substantially impaired her defense. Thus, the trial court properly ruled that defendant's allegations concerning lost physical evidence were too speculative to establish actual and substantial prejudice. See *Adams, supra* at 137 (noting that the defendant failed to demonstrate actual and substantial impairment by showing how the missing evidence would have benefited the defense).

Moreover, the trial court did not clearly err in finding that the delay in this case resulted from the police conducting further investigation and because the prosecutors were simply not satisfied that the evidence was sufficient to proceed. Either reason was a proper basis to delay prosecution. As this Court noted in *Adams*:

"In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of fair play and decency, a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of orderly expedition to that of mere speed. This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." [*Id.* at 140-141, quoting *Lovasco,*

*supra* at 795-796 (citations and internal punctuation omitted).]

In summary, defendant failed to establish actual and substantial prejudice from prearrest delay or that the delay was intended to gain a tactical advantage. Thus, the trial court did not abuse its discretion in denying her motions to dismiss.

IV

Finally, defendant argues that the trial court erred in denying her motion for a directed verdict with regard to the charges of open murder, felony murder, and armed robbery. Defense counsel moved for a directed verdict after the close of the proofs, claiming that "[t]he Prosecutor hasn't introduced any circumstantial or direct evidence that would place my client at the site of this murder." In response, the prosecutor contended that the elements of first-degree premeditated murder and felony murder were established because "there certainly is enough both direct and circumstantial evidence for a jury to be able to find beyond a reasonable doubt that not only was Rob Cady at Barney's that night[,] he was accompanied by Hattie Tanner, that she was the one with the knife, and that in the process of this robbery that a murder occurred." In denying the motion for a directed verdict, the trial court ruled:

Well, looking at the evidence in the light most favorable to the non-moving party; to wit, the Prosecutor, there is no question but what [sic] a murder occurred. There is no question but what [sic] an armed robbery occurred. And the only issue is whether or not there is sufficient proof to

establish that it was Hattie Tanner that is guilty of the crime.

Now, if the jury believes Mr. Walters the jury could find and when I say jury—a rational trier of fact could find that based on her statement as read by Mr. Walters; to wit, she was there, that it was her knife, and you couple that with the fact that her blood type was found in a stain at the bar that would form the basis where a rational trier of fact could conclude that it was, in fact, Hattie Tanner who committed the crime. The number of cuts and stab wounds, the positioning of the body, and the fact that it was a stab wound to the chest that penetrated the heart could be used by a rational trier of fact to conclude that it was first-degree premeditated murder.

When ruling on a motion for a directed verdict, the court must consider the evidence presented by the prosecutor up to the time the motion was made in the light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the charged crime were proved beyond a reasonable doubt. *Jackson v Virginia*, 443 US 307, 319; 99 S Ct 2781; 61 L Ed 2d 560 (1979); *People v Jolly*, 442 Mich 458, 465; 502 NW2d 177 (1993); *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001). Circumstantial evidence and reasonable inferences drawn from it may be sufficient to prove the elements of the crime. *Jolly*, *supra* at 466. This Court applies the same standard during review of the trial court's ruling on such a motion. *People v Daniels*, 192 Mich App 658; 482 NW2d 176 (1992).

To convict a defendant of first-degree murder, the prosecutor must prove that the killing was intentional and that the act of killing was accompanied by premeditation and deliberation on the part of the defendant. MCL 750.316(1)(a); *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995). Premeditation

and deliberation can be inferred from the surrounding circumstances, but the inferences cannot be merely speculative and must have support in the record. *People v Plummer*, 229 Mich App 293, 301; 581 NW2d 753 (1998); *Anderson, supra* at 537. Premeditation may be established through evidence of such factors as the prior relationship of the parties, the defendant's actions before the killing, the circumstances of the killing, and the defendant's conduct after the victim's death. *Id.*

With respect to the felony-murder charge, the prosecution's theory was that defendant murdered the victim during the course of a robbery and, alternatively, that she aided and abetted Cady in committing the felony murder. To convict defendant of felony murder as the principal, the prosecution had to prove: (1) the killing of a human being, (2) that the defendant had the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) that the killing occurred while the defendant was committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b), which includes the underlying charged offense of armed robbery. *Carines, supra* at 768; *People v Turner*, 213 Mich App 558, 565-566; 540 NW2d 728 (1995).

To support a finding that defendant aided and abetted Cady in committing felony murder, the prosecution must show that (1) the crime charged was committed by defendant or some other person, (2) defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) defendant intended the commission of the crime or had knowledge that the principal intended its com-

mission at the time that he gave aid and encourage-
ment. *Id.* An aider and abettor must have the same
requisite intent as that required of a principal. *People
v Barrera*, 451 Mich 261, 294; 547 NW2d 280 (1996).
Thus, " 'the prosecutor must show that the aider and
abettor had the intent to commit not only the underly-
ing felony, but also to kill or to cause great bodily
harm, or had wantonly and wilfully disregarded the
likelihood of the natural tendency of this behavior to
cause death or great bodily harm.' " *Turner, supra* at
567, quoting *People v Flowers*, 191 Mich App 169, 178;
477 NW2d 473 (1991). To sustain an aiding and abet-
ting charge, the guilt of the principal must be shown
beyond a reasonable doubt, but the principal need not
be convicted. *Barrera, supra* at 294-295; *Turner,
supra*, 569. "Rather, the prosecutor need only intro-
duce sufficient evidence that the crime was commit-
ted and that the defendant committed it or aided and
abetted it." *Id.*

To establish the elements of armed robbery, the
prosecution must show (1) an assault; (2) a felonious
taking of property from the victim's presence or per-
son; (3) that the taking occurred while the defendant
is armed with a dangerous weapon. MCL 750.529;
*Turner, supra* at 569.

As for the charge of first-degree premeditated mur-
der, the trial court properly denied defendant's
motion for a directed verdict. Given Detective Wal-
ters' testimony and the fact that the diluted blood-
stain on the bar sink next to the knife implicated
defendant, a rational jury could conclude that defen-
dant was present at Barney's on the night in question.
Further, on the basis of Detective Walters' testimony,
a rational jury could also find that the knife used in
committing the murder belonged to defendant. Con-

sidering the wounds inflicted upon the victim, and reasonable inferences drawn from the evidence gathered at the crime scene, a rational jury could thus conclude defendant committed first-degree premeditated murder during the course of a robbery.

On the basis of the foregoing evidence, the trial court also did not err in denying defendant's motion for a directed verdict with regard to the charge of felony murder on the theory that defendant was the principal in committing the crime.

However, the trial court erred in denying defendant's motion for a directed verdict with regard to the prosecution's theory that defendant aided and abetted in the felony murder because the prosecution failed to introduce sufficient evidence establishing Cady's guilt beyond a reasonable doubt. Viewed in the light most favorable to the prosecution, there was insufficient evidence to show that Cady, as a principal, committed felony murder.

In reaching this conclusion, it is useful to consider the prosecutor's closing argument. In his closing argument, the prosecutor contended that the evidence showed that Cady was at Barney's earlier than he claimed to have been that night. Although Cady testified at trial that he went to Barney's at about 1:00 A.M. and left when the victim could not cash his check, the prosecution pointed out that Officer Wise testified that Dennis Fodor had seen a person who looked very much like Cady at Barney's at 11:30 P.M. on March 21, 1995. The prosecutor also argued that because the victim trusted Cady, she would have told him that she was going to close early that night. According to the prosecutor, because Cady knew that the victim was closing the bar early that night, he returned to defendant's house, and Cady and defen-

dant eventually went to Barney's when the victim was closing the bar. The prosecutor further argued that Cady made their visit appear legitimate by purchasing a six-pack of Budweiser, which was the brand of beer that he drank, for $5.10. The prosecutor finally argued that either Cady or defendant stabbed the victim to death during the course of the robbery.

The principal flaw in the prosecutor's theory is that there is insufficient evidence to support it. See *People v Petrella*, 424 Mich 221, 275; 380 NW2d 11 (1985) ("While the trier of fact may draw reasonable inferences from facts of record, it may not indulge in inferences wholly unsupported by any evidence, based only upon assumption."). Specifically, there was no evidence introduced by the prosecutor showing that Cady committed felony murder as the principal. In this respect, we note that, apart from unsupported inferences and speculation, there was no evidence establishing beyond a reasonable doubt that Cady was present at Barney's at the time of the felony murder or that he participated in the crime. Because the prosecutor failed to establish Cady's guilt beyond a reasonable doubt, a rational jury thus could not convict defendant of felony murder under an aiding and abetting theory. *Barrera, supra* at 294-295; *Turner, supra* at 569. Thus, the trial court erred in not directing a verdict of acquittal on the charge of felony murder under an aiding and abetting theory.[9]

Accordingly, on retrial, the prosecution may not charge defendant with felony murder under an aiding and abetting theory. In addition, because the jury

---

[9] We note that although the members of the jury were polled after delivering their verdict, they were not asked whether they found defendant guilty of felony murder as a principal or as an aider and abettor.

acquitted defendant of first-degree premeditated murder, the doctrine of double jeopardy bars her retrial on that charge.

Reversed and remanded for a new trial. We do not retain jurisdiction.

COOPER, P.J., concurred.

R. J. DANHOF, J. (*concurring in part and dissenting in part*). I respectfully disagree with part II of the majority's opinion. The trial court's denial of defendant's request to pay for an expert in either DNA or serology did not result in a fundamentally unfair trial.

This Court reviews the decision whether to appoint an expert for an abuse of discretion. *People v Lueth*, 253 Mich App 670; ___ NW2d ___ (2002). An abuse of discretion exists when the result is so palpably and grossly violative of fact and logic that it shows a perversity of will or the exercise of passion or bias rather than the exercise of discretion. *Solution Source, Inc v LPR Assoc Ltd Partnership*, 252 Mich App 368, 381; 652 NW2d 474 (2002). In general, either permitting or excluding expert testimony is not grounds for reversal unless the party claiming error establishes prejudice by showing it was "more probable than not that a different outcome would have resulted without the error." *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999); MCR 2.613(A); MCL 769.26. Denying an indigent defendant a court-appointed expert does not warrant reversal unless it results in a fundamentally unfair trial. *People v Leonard*, 224 Mich App 569, 582-583; 569 NW2d 663 (1997). We must remember that the standard outlined in *People v Jacobsen*, 448 Mich 639, 641; 532 NW2d 838 (1995), requires a defendant to demonstrate a nexus between the facts of the case and the *need* for

an expert. In all cases, the defendant must show a need for an expert: that the defendant cannot proceed safely to trial without expert assistance. MCL 775.15; *Leonard, supra* at 582.

In this case, there were two types of scientific evidence presented by the prosecution, DNA analysis and blood serology, as well as statistical population data. The DNA evidence was clearly exculpatory. As the majority notes, Clement testified that, on the basis of the DNA profile obtained from the blood on the victim's shirt, "it could not have been Ms. Tanner." The prosecution's DNA experts not only excluded defendant and her associates as contributors to the DNA found on the evidence but also established a DNA profile of an unknown female from the blood found on the victim's shirt. In fact, it was defense counsel that moved for the admission of the prosecution's expert's report. Defendant does not explain how she was unable to proceed safely to trial as a result of the prosecution's witnesses' stating unequivocally that the blood was not hers. In fact, defendant's appellate brief does not discuss the DNA evidence at all, only the serological evidence. On the facts of this case, the absence of a defense expert was not outcome-determinative, nor did it deny defendant a fundamentally fair trial. *Lukity, supra* at 495-496; *Leonard, supra* at 583-584.

The majority relies on *State v Scott*, 33 SW3d 746 (Tenn, 2000), where the court found that expert assistance in the field of DNA evidence "was absolutely crucial to competent representation given that the subject matter was inordinately complex and beyond the common understanding of most attorneys" in a prosecution where there were "inconsistent results regarding the donor of the hair samples." *Id.* at 754.

However, an important difference in this case is that, unlike *Scott*, the DNA evidence did not contribute to defendant's conviction; in fact, it exculpated her. It is not enough for defendant to argue simply that the subject is complex or highly technical, she must show that the presence of an expert would have changed the outcome of the trial. *Leonard, supra* at 584-585 & n 5; *Lukity, supra* at 495-496.

Likewise, defendant has not established an actual need for a serologist. The blood evidence was the only physical evidence linking defendant to the scene. However, there was no dispute over the results of the tests and no allegations that the procedures were faulty. See *In re Klevorn*, 185 Mich App 672, 679; 463 NW2d 175 (1990). The majority, citing *Scott, supra* at 754, proposes that defendant needed an expert to "explain[ ] that it constituted an anomalous test result." *Ante* at 406. But the testing anomalies and contamination present in *Scott* do not exist in this case.

Defendant does not explain how an expert would help, other than arguing that, without a defense expert, the prosecutor's serologist "was free to present what might have been grossly-exaggerated findings." This presents only a mere possibility of assistance from an expert, and fails to meet the burden on defendant of showing that she could not "proceed safely to trial." *Leonard, supra* at 582; MCL 775.15; *Lueth, supra* at 688. Defendant does not argue that an expert would have refuted the conclusion that the blood found and defendant's blood were of the same type, and that none of the other suspects had that type blood. Defendant's theory, that someone else with the same type blood was the perpetrator, was fully explored on cross-examination and in closing

argument. Defendant fails to explain how the absence of an expert jeopardized her ability to prepare a defense; I therefore find no error in the trial court's denial.

Finally, although I would find no error in this matter, I include a brief response to the majority's conclusion that the prosecutor failed to prove "beyond a reasonable doubt that the constitutional error in question did not contribute to defendant's guilty verdict." *Ante* at 410. I would beg to differ. While the *evidence* may have contributed to the verdict, I do not find that the alleged *error*, i.e., the trial court's denial of a defense expert, contributed to the verdict. The blood evidence likely played a role in convincing the jury of defendant's guilt, but nothing defendant argued in this Court demonstrates that the evidence would have been any different with court-provided, expert assistance.

Similarly, appellate counsel's argument that the trial court erred in denying the motion for funds to retain a serology expert must be rejected because he has alleged no specific need for an expert. *Jacobsen, supra* at 641; *Leonard, supra* at 581-584. There are a vast number of scientific articles, treatises, and published appellate decisions available to a lawyer who lacks knowledge of the "arcane" world of criminal forensics and population genetics. General allegations that the field is technical or that expert assistance is required are insufficient to establish a need to appoint an expert. *Id.* at 584-585 & n 5.

I would affirm defendant's conviction of felony murder and the sentence for that conviction.